Rayfield Z. WILSON, Appellant,

v.

UNITED STATES, Appellee.

No. 11254.

District of Columbia Court of Appeals.

Argued Dec. 5, 1978.

Decided June 22, 1979.

Charles W. Halleck, Washington, D. C., appointed by this court, for appellant.

Michele A. Goldfarb, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee. Noel Anketell· Kramer, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellee.

Before KERN and GALLAGHER, Associate Judges, and YEAGLEY, Associate Judge, Retired. ,

KERN, Associate Judge:

A jury found appellant guilty of murder in the first degree upon testimony that he shot and fatally wounded his cousin after an apparent argument occasioned by his use of the victim's car shortly before the shooting.

Appellant contends that the trial court and the attorney appointed to defend him violated his constitutional rights by both errors of omission and commission, so that he now is entitled either to a dismissal of the indictment or at the least to a new trial.

First, appellant assigns error to the trial court for (1) permitting a series of attorneys to represent him during the criminal proceedings in deprivation of his right to effective assistance of counsel, (2) failing to order *promptly* a mental examination after his arrest for the crime, thereby depriving him of a meaningful examination *and* a realistic opportunity to defend himself on the ground of insanity, and (3) failing to interpose, sua sponte, the defense of insanity on his behalf pursuant to the teaching of *Whalem v. United States,* 120 U.S.App.D.C. 331, 346 F.2d 812, *cert. denied,* 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965), when his trial counsel resolved not to seek a separate hearing by the jury on the second phase of

the so-called bifurcated trial which he had earlier requested.

Second, appellant faults his trial counsel (not his attorney on this appeal) for failing to press an insanity defense and to raise a lack of speedy trial as grounds for dismissal of the case against him, thereby blotting out the very essence of his defense in violation of *Angarano v. United States,* D.C. App., 312 A.2d 295 (1973), *rehearing en banc denied,* 329 A.2d 453 (1974).

We first address the grounds for appeal focusing on the conduct of the trial judge. Appellant depicts himself as a victim of "the constant reassignment of counsel [which] precluded the giving of effective aid in the presentation and trial of [his case]." (Brief at 19.) In our view, however, the record does not support this self-portrayal. Rather, it reveals that the majority of the seven attorneys who represented appellant in succession were removed from the case by the court at appellant's own request because of his dissatisfaction. In sum, the court's appointment of a series of attorneys from the time the criminal proceedings began in July 1974, until the trial commenced in February 1976, was *not* the result of a systemic breakdown of the criminal justice system or judicial neglect, but instead was occasioned by the court's concern that appellant receive effective legal representation, *viz.,* counselling that was satisfactory to him.[1] Concededly, a succession of attorneys representing a single defendant might well have the effect of impairing his defense to such a point that the Sixth Amendment is violated, but we are satisfied that nothing of this sort occurred here.

As to appellant's next contention that he was denied due process by the court keeping him in the D.C. Jail rather than sending him promptly to a hospital specializing in

---

1. Thus, after appellant expressed successive dissatisfaction with each of the first two counsel representing him (both experienced members of the bar), an attorney from the Public Defender Service (PDS) was assigned to his case. This attorney in turn withdrew in favor of a PDS colleague. The latter was replaced by the court at appellant's request but the appointment of that new attorney was vacated when he proved to be unavailable. Subsequently, the sixth attorney in the case asked to be relieved of his assignment and the final attorney who represented appellant at trial entered the case in November 1975.

diagnosis and treatment of mental illness, the record reflects a difference of opinion at the very beginning as to whether he should be examined in the jail or at St. Elizabeths. Specifically, on the day after the alleged shooting appellant was presented on the complaint in the trial court which then ordered him to be examined that very day by the Forensic Psychiatrist to determine his competency to stand trial. Such an examination was in fact conducted and a report returned by day's end, stating the examiner's "serious doubts as to his competency to stand trial" and that appellant should receive "further evaluation and treatment as a psychiatric *inpatient.*" (Emphasis added.) On August 1, approximately one month after the offense, Dr. Kirby, a Staff Psychiatrist of the Forensic Psychiatry Office, examined appellant at the jail "to determine his need if any for hospitalization at St. Elizabeths Hospital for a complete pretrial mental examination." His report concluded that appellant's "mental examination could be completed by the Forensic Psychiatry Office at the D.C. Jail or on an outpatient basis." Yet another examination was conducted by the Forensic Psychiatry Office on November 4 and a conclusion reached that appellant's "mental illness is . . . sufficiently severe" to require commitment to St. Elizabeths Hospital "for completion of mental examination and for treatment of his disorder." [2]

█ It may be seen that there was a division of opinion within the Forensic Psychiatry Office as to whether appellant was in need of hospitalization for the purpose of further examination and treatment or could be examined in the jail and treated on an outpatient basis. Ultimately, on November 11, 1974, the court ordered the commitment of appellant to St. Elizabeths Hospital. A report from the Hospital on appellant's competency and presence of a mental disease or defect, if any, that might have produced the criminal incident was filed with the court on December 9. While it may be regretted that somewhat more than four months elapsed from the date appellant was incarcerated until he was hospitalized at St. Elizabeths for examination (and presumably treatment), the record contains expert opinion rendered during this period of time that such hospitalization was *not* necessary. Thus, the record does not support appellant's contention that the trial court held appellant in jail in callous or careless disregard of his need for hospitalization. Accordingly, we reject his contention that the process due him before trial was denied by the trial court.[3]

The final error allegedly committed by the trial court, according to appellant, was its failure "to hold the necessary hearing mandated by *Whalem* in order to make an informed determination whether to raise the insanity defense sua sponte." (Brief at 4.)[4] Appellant argues that the trial court, absent holding a hearing, was unable to make an informed judgment whether or not to interpose the insanity defense despite his

---

**2.** We note that appellant did not invoke D.C. Code 1978 Supp., § 11–2605(a), which permits an ex parte application to the court by an indigent defendant for financial assistance in presenting the defense of insanity through expert witnesses.

**3.** The premise of appellant's argument is that by delaying an in-hospital examination of him from June 30 to November 11, his capability to raise the defense of insanity was irreparably injured. No empirical data has been presented to support this assumption and there are cases reported in decisions in this jurisdiction which have encompassed more than six months' lapse between the offense and the hospital examination. *Cannady v. United States,* 122 U.S.App. D.C. 120, 351 F.2d 817 (1965); *Mitchell v. Unit-*

*ed States,* 114 U.S.App.D.C. 353, 316 F.2d 354 (1963).

**4.** *Whalem, supra* 120 U.S.App.D.C. at 337–38, 346 F.2d at 818–19, placed upon the trial court the duty to interpose itself the defense of insanity to "forestall the conviction of one who in the eyes of the law is *not* mentally responsible for his otherwise criminal acts." The court recognized that "when there is *sufficient question* as to a defendant's mental responsibility at the time of the crime, that issue *must* become part of the case." (Emphasis added.) The court concluded it would constitute an abuse of discretion on the trial court's part where it failed to impose an "unwanted defense" when a "combination of factors . . . required the trial judge to inject the insanity issue."

counsel's decision not to raise such defense. He points to the federal circuit court's 1974 decision in *United States v. Robertson,* 165 U.S.App.D.C. 325, 507 F.2d 1148 (1974), concluding that "a viable construction of the rule in *Whalem* requires that when a 'sufficient question' is potentially posed by differing views of experts, the trial judge must conduct on the record a thorough exploration of the same and in addition set forth in reasonable detail the reasons for his own ultimate determination." *Id.* at 338, 507 F.2d at 1161.

The record in the instant case reflects that when defense counsel advised the trial court that appellant would not pursue the insanity defense the court was confronted with two medical reports: a May 1976 "psychiatric evaluation" of appellant prepared by Dr. Pepper, a psychiatrist in private practice, concluding appellant had no mental disorder,[5] and the 1974 report from St. Elizabeths Hospital that on the date of the alleged offense "he [appellant] was not suffering from a mental disease or defect which substantially impaired his behavior controls, and the alleged offenses . . . were not the product of a mental disease or defect."[6]

Appellant points to two written reports by Dr. Wilson of the Forensic Psychiatry Office made in July and November 1974, which he argues were enough to raise a "sufficient question" about his lack of criminal responsibility and thereby trigger at least a hearing. However, these two reports were directed specifically to the question of appellant's competency to stand trial and the need, if any, for hospitalization (as opposed to remaining incarcerated while being examined) to determine this question. Thus, Dr. Wilson stated in his first report that after a very brief examination of appellant in the courthouse cellblock "I am unable to form a definitive judgment as to the defendant's competency to stand trial"

but recommended "further evaluation." In his second report under date of November 4, 1974, Dr. Wilson reported on his evaluation of appellant, carried out at the jail, to determine "whether the defendant should be committed to Saint Elizabeths Hospital for mental examination and report or whether the defendant can be fully examined [in jail] by Forensic Psychiatric Office." He concluded "his [appellant's] mental illness is nevertheless sufficiently severe as to require his commitment to St. Elizabeths Hospital for completion of mental examination and for treatment of his disorder." The record reflects that appellant *was immediately transferred to the Hospital* where the staff conference determined that he had no mental disorder and the crime was not the product of any mental illness, and requested that he be transferred back to jail custody.

We are not persuaded that Dr. Wilson's two reports, limited as they were to the narrow question of the propriety of examination of appellant at D.C. Jail to determine competency to stand trial, presented such a different expert view from the reports of Dr. Pepper and St. Elizabeths Hospital so as to raise a "sufficient question" of appellant's responsibility at the time of the crime and to require Judge Bacon to interpose the defense of insanity at trial or order a further hearing. We note in the record a careful inquiry by Judge Bacon at the time defense counsel presented the report from Dr. Pepper and elected to forego the "second phase" of the bifurcated trial:

THE COURT: You would, then, be representing to the Court that as a result of examinations, both by St. Elizabeths and by private psychiatrists, that you conclude that there is no defense with regard to your client's mental condition.

COUNSEL: That's correct.

---

5. This written report by the psychiatrist was addressed to defense counsel and was intended to confirm to him "observations and conclusions" earlier discussed with him at some length.

6. The trial court concluded appellant was competent upon the basis of the findings in the St. Elizabeths Hospital Report. Appellant did not oppose these findings then.

THE COURT: And you would have no evidence to offer, showing that he is suffering from a mental disease or was, at the time of offenses?

COUNSEL: That is correct, Your Honor.

THE COURT: Do you understand your situation, Mr. Wilson?

DEFENDANT: Well, on this, just receiving this, I was trying to concentrate on this and at present, since I am just getting it,—

THE COURT: Do you want a little time to look it over?

DEFENDANT: I would appreciate it.

THE COURT [to counsel]: Would you like to confer with him behind the courtroom . . . ?

> (Pause while [counsel] and the defendant leave the courtroom to confer.) . . .

[Supp. Record V at 126.]

THE COURT: The Court has had opportunity to read the results of the psychiatric examination made by Dr. Pepper. It indicates to the Court that he diagnoses Mr. Wilson as being of no mental disorder and that at the time of the offense, he concludes that the acts were not the product of any mental disease or defect.

[Counsel], in light of that report, what are your representations?

We had before us the issue of whether or not we would go forward with regard to the insanity defense, which you had noted. . . .

[Supp. Record V at 125.]

THE COURT: Mr. Wilson, the Court, noting that the jury has heard the evidence and has announced a verdict of guilty of murder in the first degree, the only question before the Court was whether or not there was any psychiatric opinion which would conclude that those acts were the result of any mental disease or defect, and the Court has the studies from St. Elizabeth's Hospital and this

most recent conclusion from a private psychiatrist. All of them concur that you are not suffering from a mental disease or defect and that your actions were not the product of that disease or defect. The Court, therefore, would schedule this matter for sentencing and would ask if June 11th or any day the following week is available to counsel?

[Supp. Record V at 128–29.]

■ We turn now to appellant's contention concerning his counsel's allegedly ineffective representation. He argues "a substantial defense of denial of Speedy Trial lurked in this case . . . [and] [t]he issue then is the failure of counsel to even raise that matter in defense." (Brief at 31.)[7] An examination of the record reveals that most of the delay between the date of arrest, June 30, 1974, and the trial date, February 5, 1976, springs from the continuing conflict between appellant and the attorneys successively appointed to represent him after he had continually complained about them. Thus, for example, at the arraignment in August 1974, there was confusion as to whether the attorney appointed by the court or one contacted by appellant's family was representing him and a continuance was required in order to enable appellant to determine who was to represent him. Further delay was occasioned by the examination of appellant by St. Elizabeths Hospital in November 1974. When a status hearing was held in December, appellant denounced his lawyer and the trial was ordered delayed to retain a new attorney or allow the court to appoint counsel to represent him. New counsel from PDS was named finally in January 1975, and a competency hearing held in February and trial fixed for April 1975. On March 31 defense counsel sought a continuance in order to prepare an insanity defense and appellant stated a July trial was "agreeable." When the case was called in July yet another attorney was requested by appellant who acknowledged on the record that the ap-

7. Appellant also argues (Brief at 26), that the withdrawal of "the previously planned insanity defense . . . blotted out a plainly substantial defense." Given the state of the record, the insanity defense was *not* a substantial defense.

pointment would delay his trial. The attorney who ultimately tried the case for appellant appeared of record in November 1975 and a trial date of January 1976 was set. At defense counsel's request the trial was postponed until February 1976. Under the particular circumstances here, we do not perceive that appellant's right to a speedy trial was violated or that the absence of the claim of violation of his right to speedy trial constituted a failure by counsel to raise a meritorious claim.

*Affirmed.*