Paula J. FRENDAK, Appellant,

v.

UNITED STATES, Appellee.

UNITED STATES

v.

Paula J. FRENDAK.

Nos. 11043, 11046.

District of Columbia Court of Appeals.

Argued Nov. 16, 1978.
Decided Oct. 24, 1979.

Thomas W. Farquhar, Washington, D. C., for appellant.

John W. Polk, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time brief was filed and John A. Terry and John T. Kotelly, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

John D. Aldock, Washington, D. C., appointed by the court as amicus curiae, with whom William R. Galeota, Washington, D. C., was on brief.*

Before KERN, GALLAGHER and FERREN, Associate Judges.

FERREN, Associate Judge:

A jury found appellant Paula Frendak guilty of first-degree murder, D.C.Code 1973, § 22–2401, and carrying a pistol without a license, D.C.Code 1973, § 22–3204. Troubled by evidence introduced at Frendak's competency hearings and at trial, the court conducted hearings on her sanity at the time of the crime. As a result, the court decided—over Frendak's objection—to interpose the insanity defense at a

* We wish to express our appreciation to Messrs. Adlock and Galeota and the form of Shea & Gardner for participation as *amicus curiae* by appointment of the court.

second, "insanity" phase of the trial. The jury then found Frendak not guilty by reason of insanity on both counts.

On appeal, Frendak challenges the verdict on alternate grounds. She asserts, first, that there was insufficient evidence of premeditation and deliberation to support the jury's initial determination that she committed first-degree murder. Second, Frendak—joined by the government and *amicus curiae*—attacks the present validity of *Whalem v. United States*, 120 U.S. App.D.C 331, 346 F.2d 812 (en banc), *cert. denied*, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965), in which the United States Court of Appeals for the District of Columbia Circuit held that the trial judge has discretion to raise an insanity defense over the objection of a defendant found competent to stand trial. The government urges this court, in addition, to hold that a finding of competency to stand trial is, in itself, sufficient to demonstrate that a defendant is capable of rejecting the defense.

We conclude that the government produced sufficient evidence to support a conviction for first-degree murder. As to the second issue, however, we reinterpret *Whalem, supra*. We hold that the trial judge may not force an insanity defense on a defendant found competent to stand trial *if* the individual intelligently and voluntarily decides to forego that defense. In reaching this result, however, we further hold that the court's finding of competency to stand trial is not, in itself, sufficient to show that the defendant is capable of rejecting an insanity defense; the trial judge must make further inquiry into whether the defendant has made an intelligent and voluntary decision. Because it is unclear whether Frendak made such a decision, we remand for further proceedings.

## I. *Facts; Proceedings to Date*

At approximately 2:15 on the afternoon of January 15, 1974, Willard Titlow left his

office on the seventh floor of 1735 K Street, N.W. Appellant Paula Frendak, a co-worker, departed immediately afterwards, explaining to a secretary that she had an appointment with her attorney. Within minutes, Titlow was discovered fatally shot in the first floor hallway of the building.

Following the shooting, Frendak left Washington, traveling through Atlanta, Miami, Mexico City, Spain, and Turkey before she was arrested on February 11, 1974 in Abu Dhabi, United Arab Emirates, after refusing to surrender her passport at the airport. A later search of her baggage revealed that she was carrying a .38 caliber pistol, 45 rounds of ammunition, two empty cartridges, and a pocket knife. On March 13, 1974, authorities in Abu Dhabi surrendered Frendak to the United States Marshal, who brought her back to the District of Columbia to face charges relating to the murder of Willard Titlow. On May 29, 1974, Frendak was indicted for first-degree murder and carrying a pistol without a license.

In the months preceding her trial, Frendak underwent a series of psychiatric examinations to determine her competency. There were four competency hearings at which psychiatrists gave varying testimony about Frendak's mental condition and her ability to consult with counsel concerning the proceedings against her. Ultimately, after the fourth hearing, the court determined that appellant was suffering from a personality disorder, was able to cooperate with her counsel, possessed a rational as well as factual understanding of the proceedings against her, and was fully cognizant of the charges.[1] Accordingly, the court concluded that she was competent to stand trial, although it reserved the right to raise the competency issue *sua sponte* at any point in the proceedings.

1. Judge Penn first found Frendak incompetent to stand trial on October 23, 1974, then competent on April 4, 1975. Because of the length of time that had elapsed since the previous competency hearing, and in view of the fact that the judge and the attorneys who had appeared at that hearing were no longer involved in the case, Judge Ugast conducted a third hearing and found Frendak incompetent on July 1, 1975. Finally, after a fourth hearing, he concluded that she was competent on December 23, 1975.

At trial, the government introduced evidence demonstrating that Titlow had been killed by two shots fired at close range, and that the last shot probably had been fired by someone standing over Titlow as he lay on the floor. A police expert in firearms identification testified that the ballistics tests showed positively that the bullets recovered from Titlow's body had been fired by the weapon seized from Paula Frendak in Abu Dhabi.

In addition, Robert Hur, who had worked with both Frendak and Titlow, testified that on three occasions prior to January 15, 1974, Frendak had followed him and Titlow. Another co-worker, Thomas Voit, recalled a similar incident which occurred on the day of the murder. Frendak had followed Voit and Titlow as they left the office and took the elevator down. When the elevator reached the lobby, Frendak got off, turned to Titlow and said, "Willard, this is it," meaning this is your floor. Titlow then explained that he and Voit were going to eat in the basement snack bar, although in fact they intended to slip out the basement door to avoid her. Because the basement door was locked, the men returned to the lobby and noticed Frendak standing nearby. She followed them out of the building to a cafeteria, but did not enter. When they returned from lunch, they found Frendak waiting in the lobby again, and she took the elevator up with them.

A secretary in the office recalled the incidents immediately preceding the shooting. She testified that as soon as Titlow had taken his coat from the closet and left the office for his regular sales call, Paula Frendak, who had been sitting at her desk, followed him out. As she left, she told the secretary that she had made arrangements with her supervisor to take time off to see her lawyer. A few minutes later, Titlow was found fatally wounded.

Ms. Frendak, the only defense witness, admitted owning the murder weapon and taking it with her to the scene of the murder. She explained, however, that she had

brought it with her to sell to Titlow and had left the office with him shortly before his murder in order to complete the transaction. She stated that, after giving the pistol to Titlow in the first floor hallway of the building where they worked, an unknown woman had appeared, grabbed the gun, shot Titlow twice, and then fled. Frendak also testified that she had panicked and left the city, fearing that she had been framed. The jury found Frendak guilty of first-degree murder and carrying a pistol without a license.

Although evidence of insanity had been introduced in the competency proceedings, Frendak refused to raise the insanity defense at trial. The court, therefore, appointed John Aldock, Esquire, as *amicus curiae* to aid it in deciding whether to raise the defense on its own motion, under authority of *Whalem v. United States, supra.* The court also ordered a mental examination of Frendak on the question of her criminal responsibility.

In a subsequent hearing, the court received reports by Dr. Edward C. Kirby of the staff of the Forensic Pyschiatry Office and Dr. Leon Yochelson of the Psychiatric Institute stating that, at the time of Titlow's murder, Frendak had been suffering from a mental illness which impaired her behavioral controls to such an extent that she could not appreciate the wrongfulness of her conduct and could not conform her conduct to the requirements of the law.[2] Dr. Franklin J. Pepper, a psychiatrist from St. Elizabeths Hospital, testified at the hearing, explaining that appellant had a "paranoid personality" with "some tendency to lap over into some psychotic thinking." When asked whether Titlow's murder had been a product of this condition, Dr. Pepper responded that "at some level in the workings of Miss Frendak's mind, at some level of psychodynamics . . . there is a causal connection between her mental illness and the event." He testified, however, that he was "unable to discover the cause and effect relationship." Although neither

2. Dr. Kirby described Frendak's illness as a "schizophrenic reaction, paranoid type," while Dr. Yochelson stated that she suffered from "paranoid psychosis, probably schizophrenic."

Dr. Kirby nor Dr. Yochelson discussed appellant's present capability of considering the consequences of rejecting an insanity defense, Dr. Pepper specifically stated that appellant understood the consequences of her decision not to raise the insanity defense.[3]

In oral argument at the hearing, *amicus* expressed reservations about the current status of *Whalem, supra,* in light of the later Supreme Court decisions in *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), and *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). He argued, however, that the trial court should apply the *Whalem* rule, as traditionally interpreted, raise the insanity defense, and leave the question of its current validity for appeal. Both Frendak and the prosecution opposed the trial court's imposition of the insanity defense. After hearing the evidence and argument on both sides, the trial judge reaffirmed his prior ruling that appellant was competent to stand trial. He stated, however:

Assuming, as the Court does, that no higher level or degree of competency is required of the defendant with respect to her ability to raise or not raise the issue—the defense of insanity—I find that she is able to appreciate the decision; but I would be less than candid if I did not also point out that the Court would have reservations about her ability to appreciate all facets of such a decision on her own mental health if a higher degree of competency is required with respect to the ability to make that decision.

He then found that the psychiatric evidence adduced throughout the proceedings raised a sufficient question about appellant's mental responsibility at the time of the crime to require that the court raise the insanity defense under the *Whalem* rule, although

he expressed reservations about the current validity of that rule.

The insanity phase of the case was tried before the same jury which had heard the trial on the merits.[4] *Amicus* presented evidence supporting the insanity defense. He first called Mark Freedricks, a former neighbor of Ms. Frendak, who recounted several incidents demonstrating appellant's hostile conduct toward him, including spitting at him, avoiding him, and accusing him of being a CIA agent. Doctors Kirby, Yochelson, and Pepper again testified. Dr. Kirby and Dr. Yochelson stated that, in their view, Frendak had been suffering from a major psychotic illness, characterized by delusions, hallucinations and looseness of associations. In particular, she feared that there were plots against her, especially by persons associated with the CIA. Dr. Kirby did not find any specific, logical connection between the crime and Frendak's mental disease but expressed his belief that if she had committed the crime, it was because of "her reduced behavioral control on account of her mental illness." Dr. Yochelson did see a causal link between appellant's illness and the murder, explaining that she had great difficulty forming close attachments with other people, and that this caused great anxiety. She was, the doctor speculated, beginning to develop positive feelings about Titlow and was afraid of those feelings. Titlow's murder would have provided a means of eliminating a serious external source of her anxiety.

Dr. Pepper, on the other hand, believed that Frendak had only a personality disorder with at most a borderline tendency toward psychosis, a condition characterized by hyper-sensitivity, unwarranted suspicion, jealousy, excessive self-importance, and a tendency to blame others and ascribe evil motives to them. He found no connecting link between appellant's mental disease and

3. Dr. Pepper explained that the main reason appellant had given for refusing to raise the defense was that it would be an admission of guilt.

4. In the District of Columbia, a bifurcated proceeding may be conducted when a defendant raises an insanity defense; accordingly, the trier of fact does not consider the issue of insanity

until the government has established the essential elements of the offense beyond a reasonable doubt. Only then, in the second phase, may the trier of fact reach the question of insanity. *See In re C. W. M.,* D.C.App., 407 A.2d 617, 620 (1979); *Bethea v. United States,* D.C.App., 365 A.2d 64, 94 & n.67 (1976), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977).

the crime, explaining that he did not believe she was delusional at the time of the murder, since her actions before and after the crime indicated that she had known what she was doing throughout the entire period.

Ms. Frendak testified in her own behalf, stating that she had had little contact with her former neighbor, Mr. Freedricks, and did not bear him any grudge; that she did not kill Titlow; and that the murder was all part of what she described as a "Rand Corporation game plan." On April 29, 1976, the jury returned a verdict of not guilty by reason of insanity.

█ Because the judge had imposed the insanity defense over appellant's opposition, he concluded that he could not commit appellant to a mental hospital pursuant to D.C.Code 1973, § 24–301(d).[5] The court, accordingly, directed that appellant be released unless the government initiated civil commitment proceedings within 30 days pursuant to D.C.Code 1973, § 21–541.[6]

## II. *Sufficiency of the Evidence*

Appellant's first argument is directed at the sufficiency of the evidence supporting

the charge of first-degree murder. She concedes that the prosecution produced sufficient evidence of second-degree murder in its case-in-chief to warrant submission of the case to the jury, but she asserts that the trial court erred in denying her motion for judgment of acquittal on the first-degree murder count at the close of the government's case because the government failed to introduce evidence sufficient to demonstrate that she had acted with premeditation and deliberation rather than on impulse.[7]

█ In evaluating a claim of insufficient evidence, an appellate court must review the evidence in the light most favorable to the government, recognizing the jury's right to determine the credibility of the witnesses and draw justifiable inferences from their testimony. *See Franey v. United States*, D.C.App., 382 A.2d 1019, 1022 (1978); *Williams v. United States*, D.C. App., 357 A.2d 865, 867 (1976); *United States v. Fench*, 152 U.S.App.D.C. 325, 333, 470 F.2d 1234, 1242 (1972), *cert. denied*, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973).

---

5. When a defendant raises an insanity defense and is acquitted on that ground, the individual is automatically "committed to a hospital for the mentally ill" for up to 50 days, within which period he or she is entitled to a release hearing at which "the person confined shall have the burden of proof" that sanity has been restored. D.C.Code 1973, § 24–301(d). The automatic commitment provisions of § 301(d) do not apply when the trial court raises an insanity defense over the defendant's objection. *United States v. Wright*, 167 U.S.App.D.C. 309, 311, 511 F.2d 1311, 1313 (1975); *see Lynch v. Overholser*, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); *Bethea v. United States*, D.C.App., 365 A.2d 64, 91 n.59 (1976), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977).

6. With the consent of all parties, the court stayed its order pending appeal; Frendak therefore remains in the Women's Detention Center.

7. In *Franey v. United States*, D.C.App., 382 A.2d 1019, 1021 (1978), this court held that if a defendant introduced evidence after the court's denial of a motion for a judgment of acquittal at the close of the government's case-in-chief, he or she waived the right to contest that denial on appeal. *See In re A. B. H.*, D.C.App.,

343 A.2d 573, 575 (1975). In such a case, this court stated that it would examine only the trial court's denial of appellant's motion at the close of all the evidence. This court acknowledged, however, that in 1967, the United States Court of Appeals for the District of Columbia Circuit had carved out an exception to the waiver rule, encompassing the situation in which "a defendant unsuccessfully seeks a judgment of acquittal at the conclusion of the government's case on first-degree murder and then presents evidence in his own defense." *Franey, supra*, 382 A.2d at 1022 n.5 (citing *Austin v. United States*, 127 U.S.App.D.C. 180, 382 F.2d 129 (1967)); *Belton v. United States*, 127 U.S.App.D.C. 201, 382 F.2d 150 (1967). In such a case, the reviewing court was expected to consider *only* the evidence introduced by the prosecution in the case-in-chief. The court in *Franey* did not purport to reject *Austin*; thus, *Austin* apparently would be binding on the court in this case. *See M. A. P. v. Ryan*, D.C.App., 285 A.2d 310, 312 (1971). Nonetheless, because we conclude that the government produced sufficient evidence in its case-in-chief to withstand the defendant's motion for judgment of acquittal, we need not consider the current validity of *Austin*.

It is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction. *See Wooten v. United States*, D.C.App., 343 A.2d 281, 282 (1975); *United States v. Fench, supra* 152 U.S.App.D.C. at 333, 470 F.2d at 1242; *Austin v. United States*, 127 U.S.App.D.C. 180, 189 n.20, 382 F.2d 129, 138 n.20 (1967). In applying this standard, the reviewing court makes no legal distinction between circumstantial and direct evidence. *Franey, supra* 382 A.2d 1023; *Calhoun v. United States*, D.C.App., 369 A.2d 605, 607 (1977).

 Under the District of Columbia first-degree murder statute, D.C.Code 1973, § 22–2401, the prosecution bears the burden of proving not only that a crime was committed intentionally but that it was done with premeditation and deliberation. *See Harris v. United States*, D.C.App., 375 A.2d 505, 507 (1977) (quoting *Austin, supra* 127 U.S.App.D.C. at 188, 382 F.2d at 137); *United States v. Peterson*, 166 U.S.App.D.C. 75, 78–79, 509 F.2d 408, 411–12 (1974). To prove premeditation, the government must show that a defendant gave "thought, before acting, to the idea of taking a human life and [reached] a definite decision to kill." *United States v. Sutton*, 138 U.S. App.D.C. 208, 216–17, 426 F.2d 1202, 1210–11 (1969) (footnote omitted) (quoting *Austin, supra* at 127 U.S.App.D.C. at 186 n.12, 382 F.2d at 135 n.12). Deliberation is proved by demonstrating that the accused acted with "consideration and reflection upon the preconceived design to kill; turning it over in the mind, giving it second thought." *Id.* (footnote omitted). Although no specific amount of time is necessary to demonstrate premeditation and deliberation, the evidence must demonstrate that the accused did not kill impulsively, in the heat of passion, or in an orgy of frenzied activity. *See Harris, supra* 375 A.2d at 508; *Peterson supra* 166 U.S.App.D.C. at 79,

509 F.2d at 412; *Austin, supra* 127 U.S.App. D.C. at 187, 190, 382 F.2d at 136, 139.

 In this case, the evidence was sufficient to support the jury's determination that Frendak acted with premeditation and deliberation, not on impulse. From the evidence introduced by the government in its case-in-chief, the jury could have found that Frendak brought the gun with her to the scene of the murder.[8] This, in itself, is highly probative of premeditation and deliberation. *See O'Connor v. United States*, D.C.App., 399 A.2d 21, 26 (1979); *United States v. Peterson, supra* 166 U.S.App.D.C. at 79, 509 F.2d at 412; *United States v. Brooks*, 146 U.S.App.D.C. 1, 9, 449 F.2d 1077, 1085 (1971); *Hemphill v. United States*, 131 U.S.App.D.C. 46, 49, 402 F.2d 187, 190 (1968). It permits "an inference that appellant arrived on the scene already possessed of a calmly planned and calculated intent to kill." *Belton v. United States*, 127 U.S.App.D.C. 201, 203, 382 F.2d 150, 152 (1967). Furthermore, the record indicates that on the day of the shooting, Frendak was carrying her passport and a large amount of money, evidence from which the jury could infer that Frendak had formulated an escape plan before the murder.

In addition, the evidence of Frendak's behavior before the crime also supports the inference that she acted with premeditation, not impulsively. On a few occasions in the weeks before the murder, Frendak had followed Titlow as he left for work. On the day of the shooting, in particular, she trailed Titlow and his friend on their way to lunch and apparently waited in the lobby of the building where they worked until they returned from their meal. Furthermore, on the day before the murder, she advised her supervisor that she had to see her attorney that afternoon, but when Titlow failed to leave the office for his regular sales call that day, Frendak also remained in the office. On the following day, she again told

---

**8.** The government's evidence demonstrated that appellant purchased the gun a few months prior to Titlow's murder; on the day after the murder, the police discovered in appellant's apartment an empty gun box with the serial number of the gun later identified as the murder weapon printed on the box; and, although appellant never returned home after the murder, she had the murder weapon with her when she was arrested in Abu Dhabi.

her supervisor that she had to leave early for an appointment with her attorney. Then, when Titlow left the office to make a sales call, Frendak, who had been waiting in the office with her coat, followed him. Moments later Titlow was found mortally wounded.

This evidence was sufficient to support the inference that Frendak acted with premeditation and deliberation rather than on impulse when she shot Titlow.[9] Frendak's claim to the contrary accordingly fails.

### III. The Current Validity of the Whalem Rule

Evidence presented during the four competency hearings and at trial had suggested that Paula Frendak may have been insane at the time she shot Willard Titlow. Thus, after the jury had convicted Frendak of first-degree murder, the trial judge found himself squarely confronted with the question whether, apropos of *Whalem, supra,* he should raise an insanity defense over the opposition of a competent defendant. After conducting a thorough inquiry with the help of *amicus,*[10] the judge concluded that *Whalem* required him, under the circumstances, to interpose the insanity defense,

despite reservations in light of *Alford, supra,* and *Faretta, supra.*

The parties do not assert that the trial court abused its discretion in applying the *Whalem* rule. They argue, rather, that *Whalem* has been substantially undermined by the Supreme Court's decisions in *Faretta* and *Alford,* and that the rule accordingly must be reconstructed. We therefore begin our analysis by considering *Whalem* and succeeding cases.

### A. Whalem and Later Cases

In *Whalem,* the United States Court of Appeals for the District of Columbia Circuit, sitting en banc, held that

when there is sufficient question as to a defendant's mental responsibility at the time of the crime, that issue must become part of the case. . . . [I]n the pursuit of justice, a trial judge must have the discretion to impose an unwanted defense on a defendant . . . . [*Id.* 120 U.S.App.D.C. at 337–38, 346 F.2d at 818–19.] [11]

The court declined to establish specific standards to guide trial judges in exercising their discretion.[12] The court stated, ambiguously, that it would conclude a judge *had*

---

**9.** Appellant relies on *Austin, supra,* and *Hemphill, supra.* This case, however, is distinguishable from *Austin* and *Hemphill,* where the victims were killed with multiple blows, suggesting that the murders were done in the heat of passion. In contrast, in this case the deceased was shot only twice. In addition, the evidence indicates that Frendak followed the deceased for several days before the killing and made a prearranged excuse to leave the office. These facts are far more indicative of a planned shooting than an impulsive one.

**10.** The trial court conducted the type of evidentiary hearing on insanity mandated by the circuit court in *United States v. Robertson,* 165 U.S.App.D.C. 325, 338, 507 F.2d 1148, 1161 (1974), whenever the evidence in a case raises a "sufficient question" as to the defendant's insanity at the time of the crime. Because *Robertson* was decided in 1974 it does not bind the judges of the Superior Court. *M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971). Although, it appears that this court has implicitly accepted *Robertson,* we have not yet formally adopted that decision. See *Wilson v. United States,* D.C.App., 403 A.2d 333, 336 (1979).

**11.** *Whalem* was in part based upon the circuit court's decision in *Overholser v. Lynch,* 109 U.S.App.D.C. 404, 288 F.2d 388 (1961) (en banc), *rev'd on other grounds,* 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962), where the court held that the trial judge had the discretion to refuse a defendant's request to change his plea to guilty when there was evidence indicating that he had been insane at the time of the crime. The court thus affirmed the trial court's verdict of not guilty by reason of insanity and the defendant's commitment to Saint Elizabeths. On appeal to the Supreme Court, appellant did not contest, and the Court did not consider, the validity of the trial court's verdict of not guilty by reason of insanity. *Lynch v. Overholser,* 369 U.S. 705, 708 n.3, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1963). The Court reversed, holding that an insanity acquittee could not be automatically committed to a mental institution unless he had raised the insanity defense.

**12.** In a footnote, the court stated:

No rigid standard exists to control the District Court in deciding whether it should require the insanity issue to be submitted. As a matter within the sound discretion of the

abused his or her discretion if he or she failed to raise the defense despite the existence of "a combination of factors which required the trial judge to inject the insanity issue." *Id.* 120 U.S.App.D.C. at 338, 346 F.2d at 819. In the case before it, the court concluded that the trial judge had not erred in refusing to interpose the defense because both psychiatric reports negated an insanity defense. *Id.* 120 U.S.App.D.C. at 338, 346 F.2d at 819.[13]

Although the circuit court has reaffirmed *Whalem* on several occasions,[14] the only additional guidance it has given to trial judges has been to mention several factors that would support a court's decision to interpose the defense. Among these are the bizarre nature of the crime, the desire of defense counsel to raise the defense, the differing views of experts as to insanity at the time of the offense, and the defendant's behavior at trial (as it indicates his or her mental condition). *See United States v. Robertson*, 165 U.S.App.D.C. 325, 335, 507 F.2d 1148, 1158 (1974). Although the court has recognized that the decision of a compe-

District Court, this question must be resolved on a case by case basis. [*Whalem, supra* 120 U.S.App.D.C. at 338 n.10, 346 F.2d at 819 n.10.]

13. It appears that only a few courts in other jurisdictions have considered this issue. While most of these courts have accorded trial judges the discretion to impose an insanity defense on the accused, they generally have not explained the rationale behind the decision, and, by and large, their decisions are not very helpful. *See State v. Fernald*, 248 A.2d 754, 761 (Me.1968) (trial court did not abuse discretion in refusing to permit defendant to withdraw plea of not guilty by reason of insanity); *Walker v. State*, 21 Md.App. 666, 671, 321 A.2d 170, 174 (1974) (where court has before it competent, uncontradicted evidence that accused was insane at the time of the crime, it would be manifest injustice to permit withdrawal of insanity plea); *State v. Paultz*, 299 Minn. 113, 117, 217 N.W.2d 190, 192 (1974) (to promote just determination of law, trial judge has authority to raise an insanity defense defendant had not affirmatively pursued) (citing *Whalem* ); *State v. Smith*, 88 Wash.2d 639, 642–43, 564 P.2d 1154, 1156 (1977) (en banc) (judge had inherent power to impose insanity defense *sua sponte* over objection of defendant and counsel; it would be unconstitutional to permit conviction of a defendant who was legally insane at the time of the crime); *cf. List v. State*, 18 Md.App. 578, 585–87, 308 A.2d 451, 455–56 (1973), *vacated on other grounds,* 271 Md. 367, 316 A.2d 824 (1974) (defense counsel had authority to enter insanity plea irrespective of defendant's express objection; trial court did not abuse discretion in refusing to permit defendant to withdraw plea of not guilty by reason of insanity at the close of the evidence); *State v. Hermann*, 283 S.W.2d 617, 620 (Mo.1955) (dictum) (evidence of insanity may be introduced over the defendant's objection if his friends or counsel set up the defense).

*But see People v. Gauze*, 15 Cal.3d 709, 717–18, 125 Cal.Rptr. 773, 778, 542 P.2d 1365, 1370 (1975) (en banc) (a court cannot on its own motion compel a defendant to plead not guilty by reason of insanity); *People v. Redmond*, 16 Cal.App.3d 931, 938–39, 94 Cal.Rptr. 543, 548–49 (1971) (a competent defendant must be permitted to withdraw insanity plea); *Boyd v. People*, 108 Colo. 289, 293–94, 116 P.2d 193, 194–95 (1941) (interpreting Colorado statute; under no circumstances can court enter plea of not guilty by reason of insanity when defendant refuses to enter any plea; defendant has absolute right to be tried on plea of not guilty); *White v. State*, 17 Md.App. 58, 61–64, 299 A.2d 873, 875, *cert. denied, id.* (1973) (trial court did not err in permitting competent defendant to withdraw insanity plea before trial; asserting a plea of insanity is no different from asserting any other affirmative defense, and whether defense should be raised is a matter of trial strategy to be determined by counsel in consultation with the client); *People v. Gonzalez*, 20 N.Y.2d 289, 294–95, 282 N.Y.S.2d 538, 542–43, 229 N.E.2d 220, 223 (1967), *cert. denied*, 390 U.S. 971, 88 S.Ct. 1093, 19 L.Ed.2d 1182 (1968) (not improper for trial court to fail to interpose insanity defense *sua sponte* where defendant appearing pro se had failed to raise the defense; had defendant been represented by counsel who failed to raise the defense, it would have been assumed that the attorney had consulted with the client who was unprepared to risk confinement in a mental institution).

14. The court has consistently upheld the discretion of trial judges, both when they decided to raise the defense and when they did not. *Compare United States v. Wright*, 167 U.S.App.D.C. 309, 511 F.2d 1311 (1975) *and United States v. Ashe*, 155 U.S.App.D.C. 457, 478 F.2d 661 (1973) (defense properly raised by trial court) *with United States v. Simms*, 150 U.S.App.D.C. 182, 463 F.2d 1273 (1972) *and Cross v. United States*, 128 U.S.App.D.C. 416, 389 F.2d 957 (1968); *Trest v. United States*, 122 U.S.App. D.C. 11, 350 F.2d 794 (1965) (per curiam), *cert. denied*, 382 U.S. 1018, 86 S.Ct. 634, 15 L.Ed.2d 532 (1966); *cf. United States v. Bradley*, 149 U.S.App.D.C. 405, 463 F.2d 808 (1972) (per curiam) (failure to pursue insanity defense not abuse of discretion).

374 ■

tent defendant is highly relevant, *Cross v. United States*, 128 U.S.App.D.C. 416, 419, 389 F.2d 957, 960 (1968); *accord, United States v. Robertson*, 430 F.Supp. 444, 447 (D.D.C.1977), the court has emphasized that a defendant's reasons must be weighed as part of a full presentation of evidence relevant to the issue of criminal responsibility. *Robertson, supra* 165 U.S.App.D.C. at 337, 507 F.2d at 1160; *accord, United States v. Snyder*, 174 U.S.App.D.C. 117, 121–22, 529 F.2d 871, 875–76 (1976).[15] The circuit court has stated explicitly, moreover, that the defendant's decision to reject the defense could not be controlling. *Robertson, supra* 165 U.S.App.D.C. at 337, 507 F.2d at 1160. It is fair to say, in summary, that in decisions following *Whalem*, the circuit court, in effect, has encouraged trial judges to focus their principal attention on those factors (especially expert testimony) related to the strength of the evidence supporting a potential insanity defense, rather than on the defendant's present desire not to raise the defense and on the current ability to make an intelligent choice.

The circuit court's deemphasis of the defendant's choice is generally consistent with the stated aim of the *Whalem* rule. In explaining its rationale, the court declared that the trial judge has a responsibility to prevent the conviction of one who was insane at the time of committing an offense, because such an individual lacks criminal responsibility and, accordingly, must not be punished.[16] *Whalem, supra* 120 U.S.App. D.C. at 337, 346 F.2d at 818; *see Overholser v. Lynch*, 109 U.S.App.D.C. 404, 409, 288 F.2d 388, 393 (1961) (en banc), *rev'd on other grounds*, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962). Were this the only purpose of the rule,[17] however, it would be difficult to justify giving the trial court any discretion to refuse the defense once the judge became aware of evidence that could support a jury finding of not guilty by reason of insanity. The fact that *Whalem* granted trial courts discretion, therefore, suggests that the court may have been acknowledging other interests. At least one member of the circuit court has suggested that the flexibility of the *Whalem* rule permits trial judges to recognize the decision of the defendant who chooses not to raise the defense. *See Robertson, supra* 165 U.S. App.D.C. at 338, 507 F.2d at 1161 (separate

15. On remand, the District Court in *Robertson* summarized several factors relevant to a judge's decision to raise the defense: (1) the quality of the evidence supporting the defense, (2) the defendant's wishes, (3) the quality of the defendant's decision not to raise the defense, (4) the reasonableness of the defendant's motives for opposing the defense, and (5) the court's personal observation throughout the proceedings against the defendant. *See Robertson*, 430 F.Supp. at 446.

16. The court stated:
One of the major foundations for the structure of the criminal law is the concept of responsibility, . . . If [a defendant] does not know what he is doing or cannot control his conduct or his acts are the product of a mental disease or defect, he is morally blameless and not criminally responsible. . . . In other words, the legal definition of insanity in a criminal case is a codification of the moral judgment of society as respects a man's criminal responsibility; and if a man is insane in the eyes of the law, he is blameless in the eyes of society and is not subject to punishment in the criminal courts.
In the courtroom confrontations between the individual and society the trial judge must uphold this structural foundation by refusing to allow the conviction of an obviously mentally irresponsible defendant, and when there is sufficient question as to a defendant's mental responsibility at the time of the crime, that issue must become part of the case. [*Whalem, supra* 120 U.S.App.D.C. at 337, 346 F.2d at 818 (footnote omitted). *See generally* ABA Standards, The Function of the Trial Judge § 1.1(a) (1972).]

17. In *Lynch, supra*, the circuit court advanced another rationale for a *Whalem*-type rule. It explained that society has an interest in ensuring that one who was criminally insane receives rehabilitation. *See Lynch, supra* 109 U.S.App.D.C. at 409–10, 288 F.2d at 393–94; *Note*, 53 Tex.L.Rev. 1065, 1067 (1975). This theory is deficient in two respects: First, it presumes that one who was insane at the time of the offense is still insane and in need of treatment. Second, it is based on the premise that the court can automatically commit an insanity acquitee even when the court raises the defense. The Supreme Court expressly rejected this notion on appeal, explaining that a defendant who had not raised an insanity defense could not be automatically committed. *See note 5 supra*.

statement of Bazelon, C. J.); *accord, People v. Redmond*, 16 Cal.App.3d 931, 936, 94 Cal. Rptr. 543, 547 (1971).

All the parties to this appeal assert, nonetheless, that the *Whalem* rule does not accord sufficient respect to the intelligent choice of a competent defendant. They argue that the rule leaves the trial judge too much discretion to force an unwanted insanity defense on a competent defendant if the evidence supporting such a defense is sufficiently compelling. Such a result, they maintain, is inconsistent with the Supreme Court's recent decisions in *Faretta, supra,* and *Alford, supra,* which emphasize that defendants must have the right to make decisions central to their defense, since they must bear the consequences of these decisions. We turn, therefore, to these Supreme Court cases, in order to assess their impact on *Whalem.*

B. *The Impact of North Carolina v. Alford and Faretta v. California on the Whalem Rule*

In *Alford, supra,* the Supreme Court held that it was not unconstitutional for a trial judge to accept a guilty plea from a defendant who protested his innocence. 400 U.S. at 38, 91 S.Ct. 160 (citing *Lynch v. Overholser*, 369 U.S. 705, 719, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962)). The Court emphasized that a defendant claiming innocence of a crime may nevertheless have important reasons for pleading guilty; for example, by pleading guilty to the charge or to a lesser offense, the defendant may be able to receive a shorter sentence than he or she would by risking conviction. *Id.* 400 U.S. at 37, 91 S.Ct. 160; *see McCoy v. United States,* 124 U.S.App.D.C. 177, 179, 363 F.2d 306, 308 (1966). The Court explained its rationale, stating:

The prohibitions against involuntary or unintelligent pleas should not be relaxed, but neither should an exercise in arid

logic render those constitutional guarantees counterproductive and put in jeopardy the very human values they were meant to preserve. [*Id.* 400 U.S. at 39, 91 S.Ct. at 168.]

A few years later in *Faretta, supra,* the Court expressed a similar concern for the right of a defendant to control the defense; it recognized that the Sixth Amendment guarantees "the right to self-representation—to make one's own defense personally." *Id.* 422 U.S. at 819, 95 S.Ct. at 2533. Accordingly, the Court prohibited a state from requiring a defendant to accept an attorney when he wished instead to appear pro se. While recognizing that a pro se defendant ultimately may conduct the defense to his or her own detriment, the Court declared that "his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Id.* 422 U.S. at 834, 95 S.Ct. at 2541 (quoting *Illinois v. Allen,* 397 U.S. 337, 350–51, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan J., concurring)); *see United States v. Dougherty,* 154 U.S.App.D.C. 76, 88, 473 F.2d 1113, 1125 (1972).[18]

*Alford* and *Faretta* both stress the importance of permitting a defendant to make decisions central to the defense—a concern given little if any significance in *Whalem.* Neither case, however, renders the *Whalem* rule unconstitutional. In *Alford,* the Court expressly stated that a defendant does not have an absolute, constitutional right to have the trial court accept a guilty plea. *Alford, supra* 400 U.S. at 38 n. 11, 91 S.Ct. 160; *see Lynch v. Overholser,* 369 U.S. 705, 719, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962) (by implication). It presumably follows, therefore, that although *Alford* supports reinterpreting *Whalem, see California v. Redmond, supra,* 16 Cal.App.3d at 938, 94 Cal.Rptr. at 548, *Alford* does not imply a constitutional right to forego the insanity defense.

---

**18.** The Court expressed a similar concern for the rights of the defendant in *Estelle v. Williams,* 425 U.S. 501, 512, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126 (1976), when it stated:

Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system.

Similarly, the Court's decision in *Faretta*, a few years after *Alford*, did not make it unconstitutional for a trial court to interpose an insanity defense. Although the Court spoke in broad terms of a defendant's "constitutional right to conduct his own defense," *Faretta, supra* 422 U.S. at 836, 95 S.Ct. at 2541, the decision is limited to recognizing a Sixth Amendment right to appear pro se; it did not confer upon the accused a constitutional right to control all aspects of the defense. *See Clyburn v. United States*, D.C.App., 381 A.2d 260, 263 n. 7 (1977) (dictum), *cert. denied*, 435 U.S. 999, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978) (*Faretta* does not overrule *Whalem* ; it does not hold that a court must recognize an incompetent or insane defendant's right to self-representation).[19]

Nevertheless, the underlying philosophy of *Alford* and *Faretta* is inconsistent with *Whalem* as currently interpreted. *Whalem* and succeeding cases have laid substantially more emphasis on the strength of the evidence supporting an insanity defense than on the defendant's choice. In contrast, *Alford* and *Faretta* reason that respect for a defendant's freedom as a person mandates that he or she be permitted to make fundamental decisions about the course of the proceedings.

We find the rationale underlying *Faretta* and *Alford* compelling support for appellant's position in this case, since there are persuasive reasons why defendants convicted of an offense may choose to accept the jury's verdict rather than raise a potentially successful insanity defense. First, a defendant may fear that an insanity acquittal will result in the institution of commitment proceedings which lead to confinement in a mental institution for a period longer than the potential jail sentence. *E. g., Robertson, supra*, 430 F.Supp. at 448; *California v. Redmond, supra* 16 Cal.App.3d at 934–35, 94

Cal.Rptr. at 545–46; *see Jones v. United States*, D.C.App., 396 A.2d 183 (1978) (rehearing granted). Although a judge may not automatically commit an accused to a mental institution if the judge, rather than the defendant, has raised the insanity defense, *see* note 5 *supra*, the state has a right to initiate civil commitment proceedings against an insanity acquittee. *See United States v. Wright*, 167 U.S.App.D.C. 309, 311, 511 F.2d 1311, 1313 (1975). The risk of civil commitment following a conviction could be substantial, especially if the crime involved violence.

Second, the defendant may object to the quality of treatment or the type of confinement to which he or she may be subject in an institution for the mentally ill. If in need of psychiatric care, the individual may prefer the prospect of receiving whatever treatment is available in the prison. There are, moreover, "numerous restrictions and routines in a mental hospital which differ significantly from those in a prison." *Matthews v. Hardy*, 137 U.S.App.D.C. 39, 43, 420 F.2d 607, 611 (1969), *cert. denied*, 397 U.S. 1010, 90 S.Ct. 1231, 25 L.Ed.2d 423 (1970). One commentator has written that

hospitalization itself interferes with privacy, since the patient cannot shield himself from constant observation by both his fellow patients and the staff of the institution. Furthermore, patients in hospitals risk brutality at the hands of their fellow residents and even their attendants, and may be subject to life in an institution which is overcrowded, inadequately staffed, poorly maintained, and unsanitary. [*Developments in the Law— Civil Commitment of the Mentally Ill*, 87 Harv.L.Rev. 1190, 1195–97 (1974) (footnotes omitted); *see Parham v. J. R.*, —— U.S. ——, ——, 99 S.Ct. 2493, 2516, 61 L.Ed.2d 101 (1979) (Brennan, J., dissenting in relevant part).]

---

**19.** Lower courts have been careful to construe *Faretta* to grant nothing more than a right to self-representation. *See United States v. Wilhelm*, 570 F.2d 461, 464–66 (3d Cir. 1978) (Sixth Amendment does not entitle accused to representation by nonlawyer); *United States v. Cyphers*, 556 F.2d 630, 634 (2d Cir.) (Sixth

Amendment does not guarantee a defendant represented by counsel the right to participate in trial as co-counsel), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977); *United States v. Hill*, 526 F.2d 1019, 1024 (10th Cir. 1975) (same), *cert. denied*, 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976).

Ms. Frendak, in particular, has indicated that she considers the hospital worse than any prison and, in order to avoid institutionalization there, has gone on hunger strikes, attempted suicide, and refused medication.

Third, a defendant, with good reason, may choose to avoid the stigma of insanity. In the District of Columbia, a jury may consider an insanity defense only after it has found the accused guilty of an offense beyond a reasonable doubt. *Bethea v. United States*, D.C.App., 365 A.2d 64, 94 & n.67 (1976), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977). Although an insanity acquittal officially absolves the defendant of all moral blame, in the eyes of many some element of responsibility may remain. Thus, the insanity acquittee found to have committed criminal acts and labeled insane may well see oneself "twice cursed." *See Matthews v. Hardy, supra* 137 U.S.App.D.C. at 42–43, 420 F.2d 610–11 (quoting *United States ex rel. Schuster v. Herold*, 410 F.2d 1071, 1073 (2d Cir.), *cert. denied*, 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969)). In addition, many persons do not understand mental illness, and some have an irrational fear of the mentally ill. Thus, an individual once labeled insane may be socially ostracized and victimized by employment or educational discrimination. *See Developments, supra* at 1200; *see Parham v. J. R., supra*, —— U.S. at ——, 99 S.Ct. at 2503; *id.* at 2514 (Stewart, J., concurring).

Fourth, other collateral consequences of an insanity acquittal can also follow the defendant throughout life. *See generally*

*In re Ballay*, 157 U.S.App.D.C. 59, 62–64, 482 F.2d 648, 651–53 (1973). In some states, an adjudication of insanity may affect a person's legal rights, for example, the right to vote or serve on a federal jury, and may even restrict his or her ability to obtain a driver's license.[20] Such an adjudication also may adversely affect the defendant in any interaction with the legal system. For instance, it may be used to attack his or her capacity as a trial witness, or could be admissible in a criminal trial to attack the character of a defendant who has put his or her character in issue. Furthermore, the record of such an adjudication would surely be used in any subsequent proceeding for civil commitment. *See generally Ballay, supra*, 157 U.S.App.D.C. at 62–63, 482 F.2d at 651–52; *Developments, supra* at 1198–1201.[21]

Finally, a defendant also may oppose the imposition of an insanity defense because he or she views the crime as a political or religious protest which a finding of insanity would denigrate. *See Robertson, supra*, 165 U.S.App.D.C. at 335, 507 F.2d at 1158; *cf. id.* 165 U.S.App.D.C. at 342 n.13, 507 F.2d at 1165 n.13 (Wilkey, J., dissenting) (pointing to examples of "horrors" in other countries that might arise here if courts were permitted to raise the insanity defense over the wishes of a competent defendant).[22] In any event, a defendant may choose to forego the defense because of a feeling that he or she is not insane, or that raising the defense would be equivalent to an admission of guilt. *See United States v. Snyder*, 174 U.S.App.D.C. 117, 121, 529 F.2d 871, 875

**20.** The District of Columbia, however, provides unqualified protection for the civil rights of those adjudicated insane, even those persons who are currently institutionalized. D.C.Code 1973, § 21–564(a).

**21.** We recognize that a defendant who chooses not to raise an insanity defense, although mentally ill and in need of treatment, can be transferred because of present mental illness to a mental institution after trial and before sentencing, D.C.Code 1973, § 24–301(a), or while in prison, D.C.Code 1973, § 24–302. In either situation, he or she would very likely suffer many if not all the deprivations and social approbation which follow an insanity acquittal.

A defendant with a potential insanity defense must be made aware of these possibilities before the court accepts his or her decision. Nevertheless, because an individual who was mentally ill at the time of the crime may no longer be insane, or may not be so disturbed that a transfer would be advisable, he or she must have the right to consider and, if capable, accept these risks.

**22.** Ms. Frendak, for example, who maintained that the CIA framed her for Titlow's murder as part of a plot, may feel that a finding of insanity would make a lie of the defense that she vigorously and sincerely asserted.

(1976); *People v. Merkouris,* 46 Cal.2d 540, 550–52, 297 P.2d 999, 1007 (1956).

In our view, these reasons substantially outweigh the express purpose of *Whalem* : to ensure that some abstract concept of justice is satisfied by protecting one who may be morally blameless from a conviction and punishment which he or she might choose to accept. Because the defendant must bear the ultimate consequences of any decision, we conclude that if a defendant has acted intelligently and voluntarily, a trial court must defer to his or her decision to waive the insanity defense.[23]

It follows, however, that the underlying protective rationale of *Whalem* is sufficiently compelling that the trial court still must have the discretion to raise an insanity defense, *sua sponte,* when a defendant does not have the capacity to reject the defense. We acknowledge that a defendant who chooses to forego an insanity defense relinquishes important safeguards intended to protect persons who are not legally responsible for their acts from punishment and culpability in the eyes of society.[24] In *Faretta* and *Alford,* the Supreme Court permitted the defendants to waive constitu-

tional rights only after the trial judge had assured himself that the accused was capable of making a voluntary and intelligent choice. *See Faretta, supra,* 422 U.S. at 835, 95 S.Ct. 2525; *Alford, supra,* 400 U.S. at 31, 37, 91 S.Ct. 160.[25] We conclude that a trial judge must seek the same type of assurance when a defendant chooses to reject an insanity defense.[26] The court must ensure that the defendant understands the consequences of his or her choice and makes the decision voluntarily. Moreover, because the court is dealing with an individual whose mental health was once in question, it is especially important to ensure that the defendant is capable of intelligently refusing to make the defense. *Hawkins v. United States,* D.C.App., 385 A.2d 744, 747 (1978). Thus, the trial court need only respect the defendant's choice when it determines that the defendant "knows what he is doing and his choice is made with eyes open." *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942); *accord, Faretta, supra* 422 U.S. at 835, 95 S.Ct. 2525.

In summary, by our holding here we do not abolish the *Whalem* rule; rather, we

**23.** As we noted earlier, the Supreme Court in *Alford, supra,* declined to hold that a judge was constitutionally required to accept an intelligent and voluntary guilty plea. It stated, however, that the states "by statute or otherwise" could confer on defendants a right to have their guilty plea accepted, or, in the alternative, could bar the courts from accepting the plea of one who maintains his or her innocence. *Id.* 400 U.S. at 38 n.11, 91 S.Ct. 160. In light of the significant reasons that a defendant may have for electing not to assert an insanity defense, and because of the increased emphasis on individual choice in *Alford* and *Faretta,* we deem it important to limit the trial court's discretion in this area.

**24.** Although the right to raise an insanity defense is well accepted in this country, the Supreme Court has never held that a criminal defendant has a constitutional right to raise an insanity defense. *See Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). *But cf., State v. Strasburg,* 60 Wash. 106, 110 P. 1020 (1910) (en banc); *Sinclair v. State,* 161 Miss. 142, 132 So. 581 (1931) (per curiam).

**25.** The defendant in *Faretta* in choosing to proceed pro se was, of course, waiving his Sixth Amendment right to the assistance of counsel.

An individual like Alford who pleads guilty waives several constitutional rights, including the right to trial by jury and to confront his or her accusers, as well as the privilege against self-incrimination. *Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

**26.** The requirement that a defendant knowingly and intelligently waive a right or privilege has been applied in a number of contexts. *See e. g., Boykin, supra* (decision to plead guilty); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (waiver of privilege against self-incrimination); *Adams v. United States ex rel. McCann,* 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942) (waiver of right to jury trial); *Hawkins v. United States,* D.C.App., 385 A.2d 744, 747 (1978) (waiver of right to jury trial); *United States ex rel. Negron v. New York,* 434 F.2d 386, 390 (2d Cir. 1970) (waiver of non-English speaking defendant's right to translation at trial); *United States v. McPherson,* 137 U.S.App.D.C. 192, 194–95, 421 F.2d 1127, 1129–30 (1969) (waiver of right to be present at trial); *Reeves v. Warden,* 346 F.2d 915, 926–27 (4th Cir. 1965) (waiver of right to exclude illegally obtained evidence).

reinterpret it consistently with the philosophies underlying the Supreme Court's decisions in *Faretta* and *Alford*. In accordance with *Whalem*, a trial judge will still have the duty to confront the insanity issue if the evidence adduced in the proceedings raises a "sufficient question as to a defendant's mental responsibility at the time of the crime." *Whalem, supra,* 120 U.S.App. D.C. at 337, 346 F.2d at 818. The judge will also continue to have the discretion to interpose an insanity defense *sua sponte* against the will of a defendant competent to stand trial. That discretion, however, is limited. Rather than permit a trial judge (as in *Whalem*) to raise an insanity defense whenever there is a sufficient quantum of evidence supporting the defense, we require the judge to respect the choice of a defendant capable of voluntarily and intelligently making that choice. The court will now have the discretion to raise an insanity defense *sua sponte* only if the defendant is not capable of making, and has not made, an intelligent and voluntary decision. It remains, then, for us to suggest the procedure which trial judges should follow in making that determination.[27]

## C. *Procedures for Determining Whether a Trial Court May Raise an Insanity Defense Sua Sponte*

It is the government's position that a finding of competency to stand trial is, in itself, sufficient indication that the defendant is capable of intelligently waiving an insanity defense and that the court should not look further when deciding whether to raise the defense *sua sponte*. We disagree. Such a finding indicates only that a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). This standard is designed to indicate whether the accused knows enough about the facts of the case to relate them coherently to his or her attorney and to understand the nature of the proceedings. It is not intended to measure whether the defendant is also capable of making intelligent decisions on important matters relating to the defense. *Cf. United*

27. On April 10, 1978, appellant filed a motion for a hearing en banc in this case, suggesting that a favorable ruling here might require rejection of *Whalem* a decision binding on a division of this court. *See M.A.P. v. Ryan, supra.* This motion was subsequently denied by the order of the en banc court on July 6, 1978.

Our decision today does not reject *Whalem*. In fact, a decision of the United States District Court in the District of Columbia has adopted a similar view, finding it to be consistent with the *Whalem* rule. That court stated:

The Court's decision to honor defendant's opposition to imposition of an insanity defense is supported by the language and implication of the United States Supreme Court's opinions in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) and *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Just as a defendant may elect to forgo representation by counsel and just as a defendant may enter a plea of guilty for reasons bother than his guilt, so too should a defendant who is competent and whose decision is made rationally and with an awareness of its consequences be allowed to proceed to trial without introduction of an insanity defense, even though there may be evidence in the case which

could support such a defense. What the opinion in the *Whalem* case protects against is the conviction of a defendant who is obviously mentally irresponsible and who should not be held criminally responsible for his acts. In the judgment of this Court, the facts in this case do not approach the type of situation which the Court of Appeals had in mind in *Whalem*. [*Robertson,* 430 F.Supp. at 447 n.4.]

While not rejecting *Whalem*, we are aware that our holding here does reinterpret that rule. We do not believe, however, that *M.A.P. v. Ryan, supra,* obliges us to follow, inflexibly, a ruling whose philosophical basis has been substantially undermined by subsequent Supreme Court decisions. *See generally Ralpho v. Bell,* 186 U.S.App.D.C. 368, 390, 569 F.2d 607, 629 (1977) (panel cannot blindly follow prior ruling in the face of clearly controlling doctrine later enunciated by the Supreme Court); *M.A.S., Inc. v. Van Curler Broadcasting Corp.,* 357 F.Supp. 686, 691 (D.D.C.1973) (court need not follow prior ruling if the earlier decision failed to consider facts or law which, had they been dealt with, would have mandated a different result). All the parties here agree that reinterpretation of *Whalem* is in order; they differ only as to the proper formulation.

*States v. David,* 167 U.S.App.D.C. 117, 124 n.19, 511 F.2d 355, 362 n.19 (1975) (waiver of jury trial); *Sieling v. Eyman,* 478 F.2d 211, 214–15 (9th Cir. 1973) (entry of guilty plea); *In re Williams,* 165 F.Supp. 879, 881 (D.D.C.) (same), *order modified on other grounds,* 104 U.S.App.D.C. 18, 259 F.2d 175 (1958), *cert. denied,* 379 U.S. 982, 85 S.Ct. 689, 13 L.Ed.2d 572 (1965). *But see United States ex rel. McGough v. Hewitt,* 528 F.2d 339, 342 n.2 (3d Cir. 1976). *See generally Westbrook v. Arizona,* 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966) (per curiam).

■■■ For this reason, we hold that whenever the evidence suggests a substantial question of the defendant's sanity at the time of the crime, the trial judge must conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the defense, and freely chooses to raise or waive the defense. The scope of the inquiry for this determination will vary according to the circumstances present in each case, especially in relation to the background and condition of the defendant. *See Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).[28] It is important to note, however, that because the court is dealing with an individual whose sanity has been questioned, a cursory explanation or a rote interrogation cannot satisfy the court's duty. *Cf. Hawkins, supra* 385 A.2d at 747 (waiver of right to jury trial); *David, supra,* 167 U.S.App.D.C. at 123, 511 F.2d at 361 (same).

In some instances, nonetheless, it may be sufficient for a trial judge to advise the defendant of the possible consequences of the insanity plea, become assured that the defendant understands those consequences by questioning the defendant about his or her reasons for rejecting the defense, and make a decision on the basis of the reasons given, the manner in which they are expressed, and any evidence of the defendant's mental capacity already in the record. In other cases, the judge still may have doubts after such an inquiry and may desire additional information. In those situations the judge may order psychiatric examinations to determine whether the defendant's mental condition has impaired his or her ability to decide whether to raise the defense.[29] At this point, the judge may choose to appoint *amicus* counsel to present evidence concerning the defendant's mental capacity.

■■■ If the judge finds that the defendant is capable of making a voluntary and intelligent decision to forego an insanity defense, the judge must respect the defendant's decision and permit the jury's verdict to stand. *See People v. Redmond, supra,* 16 Cal.App.3d at 938, 94 Cal.Rptr. at 548. If, on the other hand, the judge is convinced that the defendant can not or has not made such a voluntary and intelligent waiver, the judge has the discretion to raise that defense *sua sponte.*[30] The strength of

---

**28.** The mental health of defendants with potentially successful insanity defenses may vary significantly. The insanity defense relates solely to an individual's mental condition at the time of the crime. It indicates *nothing about* the person's sanity at the time of a trial that may take place months or even years after the offense. Even if a defendant was mentally ill at the time of the crime, he or she could have regained sanity in the interim. In any event, even if the defendant is still mentally disturbed, it does not follow that he or she is incapable of making an intelligent choice regarding the defense. *See generally In re Boyd,* 403 A.2d 744, 747 n.5 (1979); *Cameron v. Mullen,* 128 U.S. App.D.C. 235, 244 n.29, 387 F.2d 193, 202 n.29 (1967); D.C.Code 1973, § 21–564.

**29.** One factor which could impede a defendant's ability to make an intelligent choice would be the inability of one who is currently mentally ill to recognize his or her present condition. Such refusals are a "common phenomenon" among the mentally ill. *O'Connor v. Donaldson,* 422 U.S. 563, 584, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (Burger, C. J., concurring).

**30.** Ordinarily in this situation, the trial judge will choose to raise the defense and appoint *amicus curiae* to present evidence bearing on the defense to the jury, as Judge Ugast did in this case. In some instances, when the most reasonable choice from the defendant's standpoint is to refuse the defense—for example, if the defendant is facing conviction for a misdemeanor and a short sentence—the court may choose not to raise the defense.

the individual's potential insanity defense should not be a factor in the court's decision, except to the extent that such evidence is useful in determining whether the defendant presently is capable of rationally deciding to reject the defense.[31]

In this case, Judge Ugast conducted a thorough inquiry into Paula Frendak's condition at the time of the crime and considered her present opposition to the defense. He did not however, make a specific finding with regard to whether Frendak had made an intelligent and voluntary decision on whether to raise the defense. He stated, in fact, that he "would be less than candid if he did not also point out that the Court would have reservations about her ability to appreciate all facets of such a decision on her own mental health. . . ." This statement suggests that the court had doubts about whether Frendak was making an intelligent and voluntary decision. Accordingly, we must remand the case for further proceedings.

Because the trial court has already conducted an extensive inquiry into the question of appellant's sanity, the court, on remand, may decide that it already has sufficient evidence to make a determination. If so, no further inquiry is necessary. *See Sieling, supra* at 215. Recognizing the inherent difficulties of making a retrospective determination of the validity of a waiver made years before, however, we leave to the trial court the option of conducting a new hearing to decide whether Frendak would still choose to refuse an insanity defense, and whether she would now voluntarily and intelligently waive that defense. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 148 (1966); *Dusky v. United States, supra,* 362 U.S. at 403, 80 S.Ct. 788;

*David, supra* 167 U.S.App.D.C. at 124–25, 511 F.2d at 362–63.

If the court finds that Frendak did not intelligently and voluntarily reject an insanity defense (or, if necessary, finds that Frendak is not so rejecting it after remand) —and the court thus decides that interposing the defense is an appropriate exercise of its discretion—the insanity acquittal will be valid.[32] If, however, the court decides that Frendak has made (or is making) a free choice with adequate comprehension of the consequences, then her conviction will stand and the trial judge may enter sentence accordingly. *See Redmond, supra,* 16 Cal. App.3d at 938, 94 Cal.Rptr. at 548.

*So ordered.*

KERN, Associate Judge, concurring:

This case poses for the trial court quite a difficult question: What action should a trial judge take when confronted with evidence which raises a "sufficient question as to a defendant's mental responsibility at the time of the crime," yet the defendant, adjudged competent to stand trial, insists the defense of insanity should not be raised? On the one hand, *Whalem v. United States,* 120 U.S.App.D.C. 331, 346 F.2d 812 (en banc), *cert. denied,* 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965), requires the trial court to interpose the defense of insanity to "forestall the conviction of one who in the eyes of the law is *not* mentally responsible for his otherwise criminal acts." On the other hand, *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), decided by the Supreme Court subsequent to *Whalem,* emphasize that criminal defendants

---

31. In accordance with our holding today, once a "sufficient question" of insanity confronts the court, it can decline to impose the defense on either of two grounds: (1) the defendant is presently capable of intelligently and voluntarily waiving the defense, or (2) there is insufficient evidence of insanity at the time of the offense to warrant submitting that issue to the jury. Accordingly, in conducting the inquiry, the court may choose to hold a hearing into the defendant's mental health at either point in

time, although judicial economy will often dictate a hearing on both issues.

32. The automatic commitment provisions of D.C.Code 1973, § 24–301(d), do not apply if the judge, rather than the defendant, raises an insanity defense. In such a situation, it appears that a defendant could be committed only under the civil commitment procedures of D.C. Code 1973, § 21–542. *See United States v. Wright, supra*; note 5 *supra.*

must be allowed themselves to make the truly significant decisions concerning the course of their defense.

This court, properly in my view, accommodates *Whalem* with *Alford* and *Faretta* by concluding that when there is evidence sufficient to support the defense of insanity yet the defendant objects to raising such defense

> we require the judge to respect the choice of a defendant capable of voluntarily and intelligently making that choice. The court will now have the discretion to raise an insanity defense *sua sponte* only if the defendant is *not* capable of making, and has not made, an intelligent and voluntary decision. [At 379; (emphasis added.)]

It seems to me that our decision enables a trial judge to strike the proper balance between preventing guilt from being imposed upon a defendant *not* mentally responsible for his otherwise criminal act yet permitting the defendant, who is capable of choosing and who must bear the ultimate consequence of his choice, to decide finally whether to accept conviction and risk possible imprisonment or to avoid criminal responsibility and risk possible hospitalization.

Given the extraordinary importance to both the community and a defendant of his decision to waive the insanity defense, it seems correct to conclude, as we do in this opinion, that a defendant's competency to undergo trial, standing alone, does *not* automatically mean that at trial he is also capable of "voluntarily and intelligently" waiving the defense of insanity. Rather, this court concludes, (At 380):

> [T]he trial judge must conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the defense, and freely chooses to raise or waive the defense.

Here, the conscientious trial judge, with the assistance of *amicus*, assumed that since the defendant was competent to stand trial,

it followed she was competent *also* to decide not to raise the defense of insanity. However, he expressed "reservations about her ability to appreciate all facets . . . [of her decision not to defend on the basis of insanity] if a higher degree of competency [than competency to stand trial] is required with respect to the ability to make that decision." Under these circumstances a remand is necessary so that the trial court can ascertain whether the defendant was capable of waiving the insanity defense. If so, the court must accept her decision and proceed to impose punishment; if not, proceedings appropriate after a verdict of not guilty by reason of insanity must take place.

GALLAGHER, Associate Judge, concurring in the result:

I do not have the difficulty the majority opinion has with the United States Circuit Court's decision in *Whalem*,[1] especially when one examines the way it has been later applied in the progeny of *Whalem* by the United States District Courts in this jurisdiction. After all, except as an academic exercise, it does not now matter so much what a landmark decision may have stated many years ago if it has been interpreted and honed over the succeeding years. The more important thing at this juncture is to look at the present state of the law as it has emanated from the landmark decision.

I will discuss first what genuine effect, if any, *Alford* and *Faretta* have had on the issue in this case. I will then look briefly at *Whalem* to determine whether it has the shortcomings the majority attributes to it, and then examine whether in the succeeding 15 years the United States District Court appears to have had any real difficulty applying it as it pertains to a defendant's declination to plead insanity.

What apparently triggered the re-examination of *Whalem* in this case is the conten-

---

1. *Whalem v. United States*, 120 U.S.App.D.C. 331, 346 F.2d 812, *cert. denied*, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965).

tion that *Whalem* was shaken by the decisions in *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), where the Supreme Court decided that it was not unconstitutional to accept a guilty plea from a defendant who nevertheless protests his innocence, and in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), where the Supreme Court decided that under the Sixth Amendment a defendant has the right to represent himself at his trial, no matter how ill-advised the choice may appear. Actually, neither *Alford* nor *Faretta* approaches the different considerations laid bare in *Whalem*:

One of the major foundations for the structure of the criminal law is the concept of responsibility, and the law is clear that one whose acts would otherwise be criminal has committed no crime at all if because of incapacity due to age or mental condition he is not responsible for those acts. If he does not know what he is doing or cannot control his conduct or his acts are the product of a mental disease or defect, he is morally blameless and not criminally responsible. The judgment of society and the law in this respect is tested in any given case by an inquiry into the sanity of the accused. In other words, the legal definition of insanity in a criminal case is a codification of the moral judgment of society as respects a man's criminal responsibility; and if a man is insane in the eyes of the law, he is blameless in the eyes of society and is not subject to punishment in the criminal courts.

In the courtroom confrontations between the individual and society the trial judge *must uphold this structural foundation by refusing to allow the conviction of an obviously mentally irresponsible defendant, and when there is sufficient question as to a defendant's mental responsibility at the time of the crime, that issue must become part of the case. Just as the judge must insist that the* corpus delicti *be proved before a defendant who has confessed may be convicted, so too must the judge forestall the conviction of one who in the eyes of the law is not* *mentally responsible for his otherwise criminal acts. We believe then that, in the pursuit of justice, a trial judge must have the discretion to impose an unwanted defense on a defendant and the consequent additional burden of proof on the Government prosecutor. So, our query is whether in this case there was a combination of factors which required the trial judge to inject the insanity issue for, if such factors existed, his failure to do so is an abuse of discretion and constitutes error. [Id.* 120 U.S.App.D.C., at 337–38, 346 F.2d at 819–20; emphasis added; footnotes omitted.]

We have previously rejected the contention that *Faretta* overrules *Whalem* in the matter of a *sua sponte* hearing. We said in *Clyburn v. United States,* D.C.App., 381 A.2d 260, 263–64 n.7 (1977), *cert. denied,* 435 U.S. 999, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978):

*Faretta* does not hold that a court must recognize an incompetent or insane defendant's right to represent himself. The right to conduct one's own defense would indeed be hollow under such circumstances. Moreover, the right to counsel and the defense of insanity rest on different considerations; the former affords protection against the sovereign, while the latter, if successful, removes culpability in the absence of the requisite mental state.

I see no reason to disturb this conclusion, even if a division of this court might properly do so, as it seems to me to be not seriously in doubt. I might say the Supreme Court commented in *Faretta* that "the right of self-representation has been protected by statute since the beginnings of our Nation. . . . With few exceptions, each of the several States also accords a defendant the right to represent himself . . . ." 422 U.S. at 812–13, 95 S.Ct. at 2530. Consequently, there is scarcely anything new or startling about the concept of *Faretta.*

The majority complains that, among other things, *Whalem* does not show sufficient sensitivity to the desire of the defendant to

refrain from an insanity defense. The fact of the matter is that *Whalem* necessarily respected the desire of the defendant in holding there was no abuse of discretion on the part of the trial court in not *sua sponte* injecting the insanity defense. 120 U.S. App.D.C. at 338, 346 F.2d at 819.

Later on, in *United States v. Robertson*, 165 U.S.App.D.C. 325, 507 F.2d 1148 (1974), a progeny of *Whalem*, the same court stated what seems to be inherent from *Whalem*:

> [S]ince it is a defendant's rejection which *triggers* a *Whalem* inquiry, that rejection should not have been controlling. [*Id.* 165 U.S.App.D.C. at 377, 507 F.2d at 1160; emphasis in original.]

The court goes on to say that

> [the defendant's] *rejection and his reasons for it should have been weighed with evidence derived from a full presentation of testimony relevant to the issue of criminal responsibility.* [*Id.*; emphasis added.]

That seems plain enough. True it is that *Whalem* expressly declined to lay down a *rigid standard* to bind the trial court in deciding whether to require the insanity issue to be submitted, and instead left the problem to the trial court to resolve—as a matter of discretion on a case to case basis. However, contrary to the majority opinion, I do not view that as manifesting insensitivity to the wishes of the defendant. Certainly it does not appear to have been construed insensitively by the United States District Court in this jurisdiction. On remand in *United States v. Robertson*, 430 F.Supp. 444 (D.D.C.1977), for example, the District Court fashioned what strikes me as sensible, workable criteria which might well be utilized by the trial court on remand in this case in resolving the issue:

(a) "the quality of the evidence supporting the insanity defense;"

(b) "the defendant's wish in the matter;"

(c) "the quality of defendant's decision not to raise the defense;"

(d) "the reasonableness of defendant's motives in opposing presentation of the defense;"

(e) "the Court's personal observations of the defendant throughout the course of the proceedings against him." [*Id.* at 446.]

It seems to me that *Whalem* has not caused any difficulty of implementation over the years in the District Court in this jurisdiction. That court seems to have gone about its business in doing so, as has the Circuit Court of Appeals. As the majority opinion points out, in cases posing the problem sometimes the trial judges have decided to raise *sua sponte* the insanity defense and sometimes they have not. The Circuit Court has almost always affirmed.[2] There is an established body of law in this jurisdiction on this question which seems entirely reasonable, and is there for guidance. I see no reason not to utilize it.

---

2. *See* note 14 in the majority opinion, *supra*.