**UNITED STATES of America**

v.

**James R. SNYDER, Appellant**
**(three cases).**

**No. 24575.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 13, 1975.

Decided Jan. 7, 1976.

Thomas A. Guidoboni, Washington, D. C., with whom Herbert M. Silverberg,

Washington, D. C. (both appointed by this Court) were on the brief for appellant.

David R. Addis, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, and Roger M. Adelman, Asst. U. S. Attys., were on the brief for appellee. Thomas A. Flannery, U. S. Atty. at the time the record was filed in No. 24,-575 and Harold H. Titus, Jr., U. S. Atty., at the time the record was filed in No. 73–1970 entered appearances for appellee.

Before BAZELON, Chief Judge, and TAMM and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

Each of these consolidated appeals presents a different issue. In No. 24,575 the appellant Snyder, a patient at Saint Elizabeths Hospital for the mentally ill, was charged with assault with a dangerous weapon, 22 D.C.Code § 502, and mayhem, 22 D.C.Code § 506. After a non-jury trial he was found guilty and sentenced to imprisonment for not less than three nor more than ten years on each count, the sentences to run concurrently. The question presented is whether the District Court rightly declined to interpose an insanity defense when both Snyder and his counsel urged that it not be raised.

In No. 73–1970 Snyder challenges the refusal of the District Court to approve the recommendation of the hospital authorities that he be unconditionally released.

In No. 73–2154 Snyder was convicted of escape from Saint Elizabeths Hospital in violation of 18 U.S.C. § 751(a). The government concedes that *United States v. Powell*, 164 U.S.App.D.C. 104, 503 F.2d 195 (1974) requires a reversal of this judgment.

A consolidated summary of the facts in all three cases will present the issues in focus.

In 1956 Snyder was indicted in the District Court for the murder of his ho-mosexual partner. Found competent to stand trial he was tried in 1959, adjudged not guilty by reason of insanity and committed to Saint Elizabeths Hospital. On August 5, 1963, while still a patient at Saint Elizabeths, he stabbed another patient repeatedly with an ice pick, inflicting serious wounds. By threats with the same weapon he then compelled a nursing assistant to open the door and allow him to escape. Informing the United States Attorney of the escape the Superintendent of Saint Elizabeths wrote: "Mr. Snyder is still in need of further hospitalization because of his mental condition, is considered dangerous and should be apprehended and returned as quickly as possible." Snyder was apprehended some six weeks later and returned to the hospital, but no criminal action was taken against him.

On December 1, 1968 Snyder struck a hospital employee on the head with a blunt instrument, causing him to lose one eye, his olfactory sense, and a piece of his skull. According to the employee, Peter Klaga, Snyder suddenly became violent and struck him from behind. Snyder claimed that Klaga had made homosexual advances to him and that Snyder struck him in self-defense.

On April 5, 1969 the grand jury indicted Snyder for mayhem and assault with a dangerous weapon on Klaga. In response to an order of the District Court requesting a psychiatric evaluation of the defendant the hospital reported, December 1, 1969:

Mr. Snyder has been under continued observation and has been examined by qualified members of our psychiatric staff with respect to the current charge and the following determinations have been made. It is our opinion that although Mr. Snyder suffers from sexual deviation, homosexuality and other drug dependence (multiple drugs) (alcoholic features), he is mentally competent for trial by virtue of having a rational as well as a factual understanding of the proceedings against him and being able to consult with counsel with a reasonable degree

of rational understanding. *It is also our opinion that he was mentally ill at the time of the crime but members of our staff are of conflicting opinions as to whether the crime was a product of his mental illness.* [Emphasis added]

Neither the government nor Snyder questioned the hospital's opinion that he was competent to stand trial and on January 20, 1970 the court accordingly found that he was competent. When the case came on for trial, April 29, 1970, the court referred to "the question of the possible insanity defense" and asked counsel for the defendant his "position with respect to that". Counsel responded:

. . . although we presumably would have an insanity defense available, based on Dr. Robinson's letter and the Government's position, we do not wish to interpose a defense of insanity. The reasons are two.

One, it is the defendant's position that he did not do what it is alleged that he did, and he has no wish to plead guilty to a crime which he did not commit.

The second factor is that, in terms of what happens to him at St. Elizabeth's where he is to be kept at John Howard or a lesser restrictive service, there isn't much difference between a successful insanity defense and a conviction.

I think whatever happens in this case, the chances are that he is going to remain at St. Elizabeth's. And he wishes to fight this case on the merits. He thinks he has a defense.

The prosecutor stated that although the government would not oppose an insanity defense if it were offered the government would not introduce evidence of Snyder's mental illness or raise the insanity issue. The court then turned to Snyder and the following colloquy took place:

THE COURT: Mr. Levitt [Snyder's counsel] has indicated that while there is a possibility of raising a defense by reason of insanity, he has consulted with you and you do not want to raise such a defense.

Is that correct?

THE DEFENDANT: Yes, sir. And the reason for this is the setup out at St. Elizabeth's Hospital. See, if I raise an insanity defense,—well, in the first place, I did not wish to raise an insanity defense because I didn't feel I was guilty of the crimes which were charged in the indictment.

The second was the staff, in order to substantiate a not guilty by reason of insanity verdict, was going to say that it believed that I was under the influence of drugs at the time of the incident. I know that I was not under the influence of any drugs, and the people with whom I had worked every day in behavior studies know this.

They have hundreds of pages of testimony to this. And if I raise the insanity defense, then I would be saying I am guilty, but I wasn't responsible because I was not mentally stable at the time, and this is not so.

THE COURT: Your position is that you are just not guilty, period?

THE DEFENDANT: Right.

THE COURT: Let me ask you this: Are you saying that there are indications by members of the staff in which there are conflicting opinions?

THE DEFENDANT: There were three different opinions.

THE COURT: Three different opinions. And those that held that you might have been mentally ill at the time of the offense predicated their theory on the fact that you might have been taking drugs?

THE DEFENDANT: Right. Right, sir. And they said if I wanted them to help me, I would have to plead not guilty by reason of insanity and take my chances as to when I would get out. And, knowing them the way I do, that would be a pretty harsh reality to face.

THE COURT: Well, putting myself in your position, Mr. Snyder, I think it makes a lot of sense. I'm not going

sua sponte to raise the issue of insanity, and I'm going to permit the defendant to conduct his defense through counsel in the way that counsel and the defendant themselves dictate.

MR. LEVITT: Thank you, Your Honor.

THE DEFENDANT: Thank you, sir.

Snyder elected to be tried by the court without a jury. Klaga testified that Snyder, who had been assigned to work with him as a helper on his truck, had assaulted him without provocation, beating him with a carpenter's hammer or pipe, and inflicting severe injuries to his head. Testifying in his own behalf Snyder claimed that Klaga made homosexual advances to him, struck him when he rebuffed the advances, and that in the ensuing fight "I happened to put my hand on something heavy and I struck him with it." The court found Snyder guilty, reasoning that even if Snyder's version of the incident were true Snyder used excessive force in repelling Klaga's advances.

The court imposed a sentence of three to ten years' imprisonment on each count, the sentences to run concurrently; however Snyder was remanded to Saint Elizabeths Hospital.

By letter of April 5, 1972 the Superintendent of Saint Elizabeths Hospital requested the District Court to order Snyder's unconditional release pursuant to Title 24, § 301(e), D.C.Code as amended. The Superintendent wrote:

Mr. Snyder has recently been reevaluated with respect to his current mental condition and as a result of our examinations and observations, it is felt that he has received maximum Hospital benefit. It is our further opinion that he has now recovered his sanity and will not be dangerous to himself and will not be dangerous to himself or others within the reasonable future by reason of mental disorder. It is therefore respectfully requested that an order for unconditional release be issued pursuant to the provisions of Title 24, Section 301(e), District of Columbia Code, as amended.

On July 15, 1972, before the court acted on the Superintendent's request for his release, Snyder again escaped from Saint Elizabeths Hospital. He was arrested in Camden, New Jersey, on September 15, 1972 and returned to the hospital.

By letter dated December 5, 1972 the Superintendent of Saint Elizabeths Hospital for the second time requested the District Court to order Snyder's unconditional release. Said the Superintendent:

We notified the Court on April 5, 1972 that it was felt that Mr. Snyder had received maximum Hospital benefit. It was our further opinion that he had recovered his sanity and would not be dangerous to himself or others within the reasonable future by reason of mental disorder. . . . Mr. Snyder was recently reevaluated and we find no substantial change in his mental condition at the present time.

The matter came on for hearing before the district judge on March 16, 1973 and upon the basis of the hospital file and testimony at the hearing the court declined to order the requested release. Later in this opinion we shall advert to the evidence presented at the hearing.

On December 8, 1972 Snyder was indicted under 18 U.S.C. § 751(a) for his escape of July 15, 1972. A jury trial on September 17, 1973 resulted in a verdict of guilty, the court having again declined to interpose the defense of insanity sua sponte. Snyder was sentenced to be imprisoned for five years, this sentence to run consecutively to any sentence then being served; and the court directed that Snyder be committed to the medical center at Springfield, Missouri.

### No. 24,575—*The Assault and Mayhem Case*

■ Snyder was found competent to stand trial in the assault and mayhem case and this finding has never been challenged. In this context he refused

to rely upon an insanity defense, a decision in which his counsel concurred. In a statement to the court he explained the reasons for his refusal. First, said Snyder, he believed he was not guilty of the offenses charged because he had acted in self-defense. Second, he said the expert opinion that he was mentally ill at the time of the offenses was predicated on the belief that he was under the influence of drugs at that time, which he denied; and "if I raise the insanity defense, then I would be saying I am guilty but I wasn't responsible because I was not mentally stable at the time, and this is not so." As the court summed up his position with his concurrence, he claimed he was "just not guilty, period". Finally, Snyder believed that reliance on an insanity plea would damage his chance for an early release from Saint Elizabeths, since the hospital staff had told him that "if I wanted them to help me, I would have to plead not guilty by reason of insanity and take my chances as to when I would get out."

Agreeing that Snyder's position made "a lot of sense"—as it plainly did—the District Court declined sua sponte to raise the issue of insanity. The court ruled in the light of *Whalem v. United States*, 120 U.S.App.D.C. 331, 346 F.2d 812, *cert. denied*, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100, *rehear. denied*, 382 U.S. 912, 86 S.Ct. 245, 15 L.Ed.2d 164 (1965). In that case this court, sitting *en banc*, said

> . . . if a man is insane in the eyes of the law, he is blameless in the eyes of society and is not subject to punishment in the criminal courts.
>
> In the courtroom confrontations between the individual and society the trial judge must uphold this structural foundation by refusing to allow the conviction of an obviously mentally irresponsible defendant, and when there is sufficient question as to a defendant's mental responsibility at the time of the crime, that issue must become part of the case. . . . We believe then that, in the pursuit of justice, a trial judge must have the discretion to

impose an unwanted defense on a defendant and the consequent additional burden of proof on the Government prosecutor. So, our query is whether in this case there was a combination of factors which required the trial judge to inject the insanity issue for, if such factors existed, his failure to do is an abuse of discretion and constitutes error. [Footnotes omitted]

120 U.S.App.D.C. at 337–38, 346 F.2d at 818–19.

The medical reports available to the trial judge in the *Whalem* case indicated that the defendant either was not insane or had not committed the offense charged because of any mental illness. Both Whalem and his counsel agreed that the insanity defense should not be raised, even though the trial judge advised counsel that if there was such a defense it should have been raised. On those facts this court held that the trial judge did not err in failing to interpose the defense sua sponte.

Since Snyder's trial took place in 1970 the district judge there ruled without the benefit of *United States v. Robertson*, 165 U.S.App.D.C. 325, 507 F.2d 1148 (1974), interpreting *Whalem v. United States*. In the *Robertson* case there was conflicting expert opinion on the issue of insanity. The District Court declined to interpose an insanity defense sua sponte. This court held that before reaching that decision the District Court should have heard "evidence supporting as well as opposing the imposition of an insanity defense." 507 F.2d at 1158. The court said:

> The common sense conclusion reached by the trial judge in this case makes especially compelling the need for the full consideration of the testimony of opposing experts. The trial court's decision not to impose the insanity defense rested, in large part, on Robertson's rejection of the defense as a "cop out." Plainly, since it is a defendant's rejection which *triggers* a *Whalem* inquiry, that rejection should not have been controlling. Robertson's rejection and his reasons for it

should have been weighed with evidence derived from a full presentation of testimony relevant to the issue of criminal responsibility.

\* \* \* \* \* \*

. . . we think a viable construction of the rule in *Whalem* requires that when a "sufficient question" is potentially posed by differing views of experts, the trial judge must conduct on the record a thorough exploration of the same and in addition set forth in reasonable detail the reasons for his own ultimate determination. In reaching that determination he is of course not bound to adopt in whole or in part the views of any expert. But no appellate court in our position can sensibly decide whether the trial judge has explored and exercised his discretion as required by *Whalem* unless the trial judge completes the exploration on the record and thereafter records in sufficient detail the reasons for his own expression of opinion.

The record is therefore remanded for supplementation in accordance with this opinion.

*Id.* 1160–61.

As we have seen, the hospital staff agreed that Snyder was mentally ill at the time of the offenses charged, but there were conflicting opinions as to whether the offenses were a product of the mental illness. In this situation we think *United States v. Robertson* is controlling and requires us to remand the case to the district judge for a hearing on the issue of criminal responsibility.[1]

### No. 73–1970—*The Unconditional Release Proceeding*

Snyder challenges the refusal of the District Court to order his unconditional release. He contends the court erred by admitting hearsay evidence at the release hearing and that the government failed to meet its burden of proof under 24 D.C.Code § 301(e).

Pursuant to 24 D.C.Code § 301(e) the Superintendent of Saint Elizabeths Hospital under date of December 5, 1972 filed with the District Court his certificate that Snyder had recovered his sanity and that in the opinion of the superintendent he would not in the reasonable future be dangerous to himself or others, and he was entitled to his unconditional release. The statute provides that if unchallenged such a certificate from the superintendent is sufficient to authorize the court to order the unconditional release of the patient. The statute further provides:

. . . but the court in its discretion may, or upon objection of the United States or the District of Columbia shall, after due notice, hold a hearing at which evidence as to the mental condition of the person so confined may be submitted, including the testimony of one or more psychiatrists from said hospital. The court shall weigh the evidence and, if the court finds that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others, the court shall order such person unconditionally released from further confinement in said hospital. If the court does not so find, the court shall order such person returned to said hospital. . . .

At the hearing on March 16, 1973 the court heard testimony from Dr. Stephen Klinger, a member of the staff of Saint Elizabeths Hospital, Dr. Gertrude V. Cooper, a psychologist at the hospital, and Detective Richard D'Auria of the Camden, New Jersey Police Department. The court also had before it the medical records of Saint Elizabeths Hospital in Snyder's case.

■ Snyder argues that the testimony of Detective D'Auria was hearsay and

---

1. Although Circuit Judges Tamm and Robb feel bound by *United States v. Robertson* they reserve the right to reexamine the holding and rationale of that decision in the event of any *en banc* hearing involving the same issue of the right of a mentally competent defendant to direct his defense.

should not have been admitted. The detective testified that on September 20, 1972 the Camden, New Jersey police, investigating the disappearance of Mrs. Muskogee Edwards, went to the basement of her house in Camden. In a trash can they "found three fingers, the remains of three fingers, a large amount of human hair, approximately 15 pounds of musk, which was lime, cement and decomposed body tissue." Also in the trash can were two sheets, two pillow cases, and a quilt, all saturated with blood. One of the fingers was identified by a print as a finger of Muskogee Edwards. Also in the basement were a hack saw, a meat cleaver, a knife and an ax, all stained with blood. Human hair on the ax and on a hack saw blade found in the trash can matched hair found on a brush and in a bureau drawer belonging to Mrs. Edwards. Further investigation disclosed that Snyder moved in with Mrs. Edwards shortly after his escape from Saint Elizabeths and lived with her until she disappeared on August 16, 1972. The investigation, including handwriting analysis, developed also that after her disappearance Snyder sold Mrs. Edwards' car, forging her name to the title certificate, forged her name to a check, and signed her name to a letter authorizing one of her employees to pay to Snyder her share of certain rent money. Finally, handwriting analysis established that Snyder forged Mrs. Edwards' signature to a letter dated September 15, 1972 and addressed to Dr. Klinger and another doctor on the Saint Elizabeths staff. The writer purported to "tell the hospital officials of his [Snyder's] activities while here in Camden, New Jersey, for the past two months", spoke in complimentary terms of Snyder's ability and conduct and concluded that "[if] given a chance for a legal release, I would like to work further with him." The letter was postmarked in Washington, D.C. on September 20, 1972—the same day the police discovered the remains of Mrs. Edwards in Camden.

The proceedings before the District Court were "not strictly adversary proceedings". *Lake v. Cameron*, 124 U.S. App.D.C. 264, 268, 364 F.2d 657, 661 (1966). The hearing was before the judge without a jury, a circumstance that normally relaxes the strict rules of proof and allows the judge to evaluate evidence without straining it through a fine technical sieve. Furthermore, the fact of the investigation in Camden was reflected in the hospital records. Thus the file shows that on September 20, 1972 Dr. Saiger, Medical Officer in charge of Snyder's ward, noted:

> Today, a call was received from Sergeant William Smith of the Camden City Police Department, Camden, New Jersey, Phone 609–365–3614, informing us that Mr. Snyder is under suspicion for homicide and narcotics offenses. I assured Sergeant Smith that Mr. Snyder is presently detained in a maximum security setting, and that *the progress of their investigation would enter into any decisions regarding change of security.* [Emphasis added]

On October 19, 1972 the Camden police followed up Sergeant Smith's call by filing a detainer against Snyder on a charge of auto theft. In his testimony Dr. Klinger indicated that he was generally familiar with the facts developed by the investigation in Camden and he said he had received the letter of September 20, 1972, purporting to have been written by Muskogee Edwards. He testified however that even if the allegations of the Camden police were true, and Snyder had murdered Mrs. Edwards and dismembered her body as the investigation indicated that would not change his opinion that Snyder was not suffering from a mental disorder. Considering all these circumstances—the character of the hearing, the contents of the hospital records, and Dr. Klinger's testimony on the subject—we think the testimony of Detective D'Auria merely fleshed out evidence that was otherwise before the court. In fulfilling his responsibility to guard against the discharge of a mentally ill patient who might be dangerous to others the judge would have been remiss had he closed his eyes to the detective's report of the investigation.

■ Having weighed the evidence as he was required to do by 24 D.C.Code § 301(e) the district judge found that Snyder still suffered from mental illness and would in the reasonable future be dangerous to others if released. Accordingly the judge denied release. In support of his ruling he reviewed the hospital diagnosis[2] of Snyder's illness and the history of his actions while a patient at Saint Elizabeths, including his two assaults on other patients. The judge also noted the evidence of Snyder's involvement in the Camden murder. He then found:

> Although Snyder's mental condition has shown marked improvement in many regards during the period of his hospitalization, he still exhibits "a great deal of anxiety" (Tr. 88) which he cannot entirely control (Tr. 90); with the propensity to express these anxieties in a harmful way, still present. (Tr. 90) At present there are indications that Snyder may suffer at least to some extent from brain damage, causing "a certain amount of rigidity," and making it somewhat difficult "to switch from one point of view to another." (Tr. 94–95) Snyder "still has difficulty in adapting quickly to new situations or in making rapid changes which may be residual to a possibly earlier organic condition." (Tr. 16) The foregoing factors, coupled to the Hospital's view that Snyder may be "untreatable" from its point of view (Tr. 45), justifies the Court's rejection of testimony on behalf of the Hospital supporting the recommendation for unconditional release. Manifestations of Snyder's longstanding mental illness are still present to such a degree that unconditional release into the community at large is not justified; and if released into the community at the present time, Snyder would pose a definite and distinct danger to the personal safety of others.

The principal testimony "supporting the recommendation for unconditional release" to which the court referred came from Dr. Klinger. Although he could not and would not say that Snyder would not be dangerous to others if released, the doctor said he was convinced that Snyder had recovered his sanity; any danger therefore would not be the result of mental illness. He conceded however that on March 24, 1972 he had signed a diagnosis stating that Snyder suffered from, among other maladies, homosexual dissociative features, a condition which causes a "panic reaction" in homosexual encounters. The report of Dr. Saiger accompanying this diagnosis stated: "Mr. Snyder has been rediagnosed on a few occasions. Thereby representing our confusion as to how to describe the underlying personality organization that has erupted into violence and criminality. . . . It was the concensus [sic] of the Medical Staff Conference in December that psychopathology was still abundantly evident." The report expressed the opinion that "Mr. Snyder has learned how to eschew violence." As an illustration of Snyder's "new modus opperandi [sic]" the report referred to occasions when, responding to "frustrating disappointments" Snyder "would become visibly angry; he would then either pace the halls banging his fist into his palm for some minutes (or hours) followed by angry verbally threatening behavior. He would then 'reassert cognitive control' and successfully reason his way toward successful accommodation to the frustration." The report concluded: "The characterologic difficulty described above and in his psy-

---

2. The original diagnosis when Snyder was admitted to the hospital in 1959 was that he was suffering from "schizophrenia, chronic undifferentiated type". In 1967 this diagnosis was changed to "Sexual Deviation, Homosexuality, Dissociative Features, Drug Addiction, Cerebral Dysrhythmia." Dr. Klinger testified that the diagnosis of cerebral dysrhythmia was later dropped but he was unsure as to when this took place. Apparently the hospital records reflected this diagnosis until just before the hearing in the release proceedings. The doctor testified that a person suffering from cerebral dysrhythmia lacks the ability to control his behavior.

chologicals is such that in patient care in a security facility with its inherent hierarchical dominance-oriented structure can only reinforce those traits. In that sense he is 'untreatable.' The posture that his therapeutic program has taken instead, i. e., diffusing the violence and working toward other sublimation of the characterological substructure seems far more useful. The alternative would be lifetime 'treatment' without likely change."

The report of March 24, 1972 was the basis for the Superintendent's April 5, 1972 recommendation that Snyder be unconditionally released. The report, signed by Dr. Klinger, contained the following diagnosis: Sexual Deviation, Homosexuality (Dissociative Features), Drug Dependence, Heroin, Other Diseases of Brain (Cerebral Dysrhythmia). The Superintendent's release recommendation of December 5, 1972 recited that Snyder had been recently reevaluated and the hospital had found "no substantial change in his mental condition" since April 5, 1972.

The report of the witness Dr. Cooper, Supervisory Clinical Psychologist, dated February 19, 1973 contained the following "personality assessment" of Snyder:

> The patient has continued to improve in his attempts to deal with emotional content. Particularly striking is his marked progress in noting his emotional reactions to inner stress as well as real life problems. He has *begun* to come to grips with his anxiety and to attempt to deal with it. In this regard *he is not always successful*, and *may decompensate* under severe stress, but frequently binds his hostile impulses by means of compulsive behaviors. He is *more likely* to verbalize rather than act out. When unable to do this he becomes severely depressed but is able to 'bounce back' readily. [Emphasis supplied]

Considering the evidence as a whole— and in particular the ambivalence and uncertainty concerning Snyder's condition reflected by the hospital records— we think it supports the findings and conclusions of the District Court. Certainly we cannot say the District Court abused its discretion in denying release. Having weighed the evidence the court properly concluded that the equivocal testimony and hospital reports were too shaky a foundation to support the Superintendent's recommendation.

In No. 24,575 the record is remanded for supplementation in accordance with this opinion. The judgment in No. 73–1970 is affirmed.[3] The judgment in No. 73–2154 is reversed.

*So ordered.*

---

3. Our judgment is of course without prejudice to future recommendations or requests for release.