UNITED STATES

v.

**James R. SNYDER, Appellant.**

No. 81–2031.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 4, 1982.

Decided Aug. 20, 1982.

As Amended Dec. 10, 1982.

Arthur B. Leavens, with whom William J. Mertens, Washington, D. C., was on the brief, for appellant.

William J. Birney, Asst. U. S. Atty., with whom Stanley S. Harris, U. S. Atty., John A. Terry, John R. Fisher and Roger M. Adelman, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Charles F. C. Ruff, Washington, D. C., also entered an appearance for appellee.

Before MacKINNON, Circuit Judge, ROBB, Senior Circuit Judge, and HAROLD H. GREENE,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge.

Following a finding of not guilty by reason of insanity to a 1956 charge of first-degree murder, Snyder has been confined at St. Elizabeth's Hospital. Through the years there have been several attempts to obtain his release and we here affirm a refusal by the district court to unconditionally release him pursuant to requests by the Superintendent of St. Elizabeth's Hospital under D.C.Code § 24–301(e) (1981) and by appellant (Snyder) under D.C.Code § 24–301(k) (1981). The facts of this case are almost unbelievable.

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

## I.

### A. *The Original Offenses*

On October 15, 1956, James R. Snyder was charged with first-degree murder for killing his homosexual paramour. A separate three-count indictment charged Snyder with robbery, assault with a dangerous weapon and unauthorized use of a vehicle.[1] After various delays,[2] Snyder was tried before a jury on the three-count indictment. The jury rejected his insanity defense and found him guilty.[3] On appeal this court remanded the case to the district court with instructions to enter a judgment of not guilty by reason of insanity. The district court entered judgment as directed and committed Snyder to St. Elizabeth's Hospital.[4]

On February 24, 1959, Snyder's first-degree murder trial commenced. Several days later on February 27, 1959, the district court granted Snyder's motion for a directed verdict of *not guilty by reason of insanity* and committed him to St. Elizabeth's Hospital under D.C.Code § 24–301(d).[5] (File II at 36–37.)

### B. *Assault and Escape in 1963*

While housed at St. Elizabeth's Hospital, Snyder on August 5, 1963 in a "rage reaction" stabbed another patient seventeen times with an ice pick and then compelled a nursing assistant under threats with the same weapon to open the door so that he could escape. (File II at 48.) Six weeks

---

1. On October 15, 1956, Snyder was charged in Criminal No. 1063–56 in a three-count indictment in connection with his robbery and assault of a woman on September 5, 1966. (District Court File, Criminal No. 1063–56 (hereinafter File I)).

2. The district court committed Snyder to St. Elizabeth's on November 30, 1956 for a mental examination to determine whether he was competent to stand trial. (District Court File, Criminal No. 1079–56 at 7 (hereinafter File II). The Superintendent of St. Elizabeth's certified to the court in an April 4, 1957 letter that Snyder was mentally incompetent, and the district court committed him for further treatment. (File II at 8.) On October 24, 1957, the Superintendent advised the court that Snyder's mental competency had been restored and on October 31, 1957, the court found Snyder competent to stand trial. (File II at 9.) During the impaneling of the jury for the trial on the three-count indictment, Snyder suffered an epileptic seizure and the court ordered Snyder recommitted for further examination.

later Snyder was apprehended but no criminal charges were filed.

### C. *Mayhem and Assault with a Dangerous Weapon in 1968*

Five years later on December 1, 1968, Snyder while on the hospital grounds assaulted a hospital employee with a ball-peen hammer, causing the employee to lose an eye, his olfactory sense and a piece of his skull. *Id.* Snyder was subsequently indicted for mayhem and assault with a dangerous weapon and at his own election was tried without a jury. Neither Snyder nor his counsel wanted to raise the insanity defense. Snyder was convicted and sentenced to concurrent sentences of three to ten years on each count.

On January 7, 1976, this court in *United States v. Snyder*, 529 F.2d 871 (D.C.Cir. 1976), held that the district court before declining to raise the issue of insanity *sua sponte*, after Snyder refused to rely on the insanity defense, should have held evidentiary hearings on the issue of criminal responsibility. Snyder's conviction for escape, described *infra*, was also reversed.

### D. *Escape and Murder in 1972*

On April 5, 1972 the Superintendent of St. Elizabeth's requested the district court to order Snyder's *unconditional* release, representing:

On May 21, 1957, the Superintendent advised the court that Snyder was again competent to stand trial and on June 3, 1958 the second trial on the three-count indictment commenced.

3. On June 27, 1958, Snyder was sentenced to consecutive terms of imprisonment totalling eight to twenty-four years.

4. The government maintains that Snyder's commitment in that case remains in force today. Brief and Appendix for Appellee at 2 n.2.

5. D.C.Code § 24–301(d) (Supp. VIII, 1960), as it existed at the time, provided:

(d) If any person tried upon an indictment or information for an offense, or tried in the juvenile court of the District of Columbia for an offense, is acquitted solely on the ground that he was insane at the time of its commission, the court shall order such person to be confined in a hospital for the mentally ill.

Mr. Snyder has recently been reevaluated with respect to his current mental condition and as a result of our examinations and observations, it is felt that he has received maximum Hospital benefit. It is our further opinion that he has now recovered his sanity and will not be dangerous to himself or others within the reasonable future by reason of mental disorder. (File II at 44)..

However, while this request was pending, Snyder on July 15, 1972 again escaped from the hospital and travelled to Camden, New Jersey where he began living with a Mrs. Muskogee Edwards. On September 15, 1972, Snyder was arrested in Camden and returned to St. Elizabeth's. Five days later, Camden police, while investigating Mrs. Edwards' disappearance, found her mutilated, decomposed remains in the basement of her home. The results of this investigation were summarized in this court's opinion in *United States v. Snyder,* 529 F.2d 871, 877 (D.C.Cir.1976), which are set forth in the margin.[6] She had apparently been murdered in gruesome fashion with a hack saw, meat cleaver, knife and ax. Camden police found that Snyder had been forging Mrs. Edwards' signature on her car title certificate, checks and personal correspondence. *Id.*

On December 5, 1972, within three months of the New Jersey murder, the Superintendent of St. Elizabeth's renewed his request to the district court that Snyder be *unconditionally* released. Three days later Snyder was indicted under 18 U.S.C. § 751(a) for escaping from the hospital. On September 17, 1973, Snyder was convicted of escape and sentenced to a consecutive five year prison term. This conviction was subsequently reversed in *United States v. Snyder, supra.*

On March 16, 1973 the district court held a hearing on the Superintendent's request for Snyder's unconditional release and denied the request. This court in *United States v. Snyder, supra,* affirmed the trial court's decision.

Following a jury trial before the Camden County Criminal Court, Snyder on April 21, 1975 was convicted of first-degree murder for killing Mrs. Edwards. Snyder was sentenced to a consecutive life term of imprisonment and was returned to St. Elizabeth's where the State of New Jersey lodged a detainer that remains in force. (File II at 59, 64.)

## II.

### A. *The 1978 Request for Unconditional Release*

On September 14, 1978, the Superintendent of St. Elizabeth's made a second request that the district court order Snyder's unconditional release, again stating that Snyder had been diagnosed as having no mental

---

**6.** We stated there:

In a trash can they "found three fingers, the remains of three fingers, a large amount of human hair, approximately 15 pounds of musk, which was lime, cement and decomposed body tissue." Also in the trash can were two sheets, two pillow cases, and a quilt, all saturated with blood. One of the fingers was identified by a print as a finger of Muskogee Edwards. Also in the basement were a hack saw, a meat cleaver, a knife and an ax, all stained with blood. Human hair on the ax and on a hack saw blade found in the trash can matched hair found on a brush and in a bureau drawer belonging to Mrs. Edwards. Further investigation disclosed that Snyder moved in with Mrs. Edwards shortly after his escape from Saint Elizabeths and lived with her until she disappeared on August 16, 1972. The investigation, including handwriting analysis, developed also that af-

ter her disappearance Snyder sold Mrs. Edwards' car, forging her name to the title certificate, forged her name to a check, and signed her name to a letter authorizing one of her employees to pay to Snyder her share of certain rent money. Finally, handwriting analysis established that Snyder forged Mrs. Edwards' signature to a letter dated September 15, 1972 and addressed to Dr. Klinger and another doctor on the Saint Elizabeths staff. The writer purported to "tell the hospital officials of his [Snyder's] activities while here in Camden, New Jersey, for the past two months", spoke in complimentary terms of Snyder's ability and conduct and concluded that "[if] given a chance for a legal release, I would like to work further with him." The letter was postmarked in Washington, D. C. on September 20, 1972—the same day the police discovered the remains of Mrs. Edwards in Camden.

disorder and expressing the opinion that he would neither be dangerous to himself nor others. The district court on October 24 and 30, 1978 held hearings on the Superintendent's request and denied it.[7]

### B. *The 1980 Request for Release*

On November 19, 1980, the Superintendent of St. Elizabeth's for a third time recommended to the district court that Snyder be unconditionally released and that he be transferred to a correctional facility in New Jersey to begin serving the balance of his life sentence. On February 27, 1981, Snyder filed a motion under D.C.Code § 24–301(k) (1981) for unconditional release. The district court held a hearing on March 11, 1981 on both the hospital's and Snyder's requests for release. The district court denied both requests and on September 11, 1981 filed factual findings to support its conclusion that Snyder was still mentally ill and dangerous to himself and others.[8]

The *district court* found as a result of the testimony presented at the hearing that Snyder "suffers from anti-social personality disorder, compulsive personality disorder and narcissistic personality disorder." *Findings and Order,* Brief and Appendix for Appellee at 31–32. The conclusion of the St. Elizabeth's staff that Snyder was no longer mentally ill was expressly rejected by a finding that there was substantial evidence of present mental pathology. *Id.* at 32. The court's finding stemmed from a number of facts. For example, one of the psychologists who examined Snyder stated that he would be "dangerous because of a mental disease or defect if the *present* Diagnostic Manual classified psychopathic personality as a mental disease or defect." *Id.* (emphasis added). The court did not

consider itself bound by either the definitions of the present Diagnostic Manual or the labels assigned by a psychologist. The court also questioned the soundness of the hospital staff's assessment of Snyder's present mental condition because of the continuing reports over the previous twenty years that he was suffering from major mental illnesses. *Id.* at 35. In addition, the court found that Snyder's past involvement with and often serious reactions to homosexuality and drugs could easily be triggered again because of the "increased probability of homosexual confrontations and/or drug abuse," *id.* at 39, that he would encounter if he were released from St. Elizabeth's and transferred to a New Jersey state prison to begin serving his life sentence for his conviction of the murder of Mrs. Edwards.

Finally, the court questioned whether the requirements of D.C.Code § 24–301(e) for unconditional release had been met since at least one of the psychologists was opposed to Snyder's unconditional release into the community; she would have recommended Snyder's release from St. Elizabeth's *only* on the condition that he be incarcerated in a prison. *Id.* at 38. This implicitly indicates that Snyder is still considered dangerous to himself and others. It should be noted that the statute only authorizes release if *all three* requirements are satisfied, i.e., (1) that he has recovered his insanity, (2) he will not be dangerous to himself or others, (3) *and* the Superintendent files a written opinion. While the problem of evaluating future conduct is admittedly difficult, St. Elizabeth's record on Snyder does not commend their judgment. It is hard to see how any reasonable person could conclude that Snyder is not dangerous to others.[9]

---

7. Snyder himself opposed the hospital's recommendation. (Tr. in Criminal No. 1079–56, IV at 44 -45.)

8. *Findings and Order* in Brief and Appendix for Appellee at 31–42.

9. The hospital's recommendation for unconditional release did not properly reply to the express standards that the statute provided as a basis for the court to make up its judgment. The hospital's November 19, 1980 recommendation stated:

In September 1978, Saint Elizabeths Hospital recommended that Mr. Snyder be unconditionally released from Saint Elizabeths Hospital because he was diagnosed as No Mental Disorder and was, in our opinion, not a dan-

ger to himself or others within the reasonable future *by reason of mental disorder.* (Emphasis added.)
R. 64.

This statement does not fully comply with the statute. The statute is plain. Its principal provisions are (1) and (2). (See n.10, *infra.*)

First, the superintendent is to *certify:* "That such person has recovered his sanity." This was not squarely complied with in 1980 by the statement that, "*In September 1978* Saint Elizabeths Hospital recommended [his unconditional release] ... because he was diagnosed as No Mental Disorder ..." While this did not follow the precise terminology of the statute it probably constituted a substantial compliance. However, a certificate by the superintendent in

### III.

■ The present appeal is from a district court order denying both the request by the Superintendent of St. Elizabeth's Hospital that Snyder be unconditionally released from the hospital pursuant to D.C.Code § 24–301(e) (1981) [10] and the request by Snyder himself that he be released pursuant to D.C.Code § 24–301(k) (1981).[11] The district court denied both requests on the

the exact words of the statute would be preferred—but the 1978 statement is *untimely* in 1980.

Second, the statute requires a statement: "(2) that in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself or others . . ." This also calls for a clear, plain certification by the superintendent with respect to Snyder's *present* dangerousness in 1980—not for a reference to a diagnosis over two years old. The statement of "*our* opinion" presumably includes that of the superintendent and is unobjectionable. But the limitation that he would not be a danger to himself or others "*by reason of mental disorder*"—does *not* comply with the statute. The statute calls for an *unqualified* statement of opinion, without limitation, that he "will not within the reasonable future be dangerous to himself or others . . ." The question of sanity is fully covered by (1). The inquiry called for by (2) is designed to give the judge a basis for evaluating the superintendent's reply to (1). Placing the quoted limitation on the opinion set forth in response to (2) thus does *not* comply with the statute and does not give the judge the information to which he is entitled. Here, though, it may have served the purpose of alerting the judge to the weakness in the certification.

**10.** D.C.Code § 24–301(e) (1981) provides:

(e) Where any person has been confined in a hospital for the mentally ill pursuant to subsection (d) of this section, and the superintendent of such hospital certifies: (1) That such person has recovered his sanity; (2) that, in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself or others; and (3) in the opinion of the superintendent, the person is entitled to his unconditional release from the hospital, and such certificate is filed with the clerk of the court in which the person was tried, and a copy thereof served on the United States Attorney or the Corporation Counsel of the District of Columbia, whichever office prosecuted the accused, such certificate shall be sufficient to authorize the court to order the unconditional release of the person so confined from further hospitalization at the expiration of 15 days from the time said certificate was filed and served as above; but the court in its discretion may, or upon objection of the United States or the District of Columbia shall, after due notice, hold a hearing at which evidence as to the mental condition of the person so confined may be submitted, including the testimony of 1 or more psychiatrists from said hospital.

The court shall weigh the evidence and, if the court finds that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others, the court shall order such person unconditionally released from further confinement in said hospital. If the court does not so find, the court shall order such person returned to said hospital. Where, in the judgment of the superintendent of such hospital, a person confined under subsection (d) of this section is not in such condition as to warrant his unconditional release, but is in a condition to be conditionally released under supervision, and such certificate is filed and served as above provided, such certificate shall be sufficient to authorize the court to order the release of such person under such conditions as the court shall see fit at the expiration of 15 days from the time such certificate is filed and served pursuant to this section: Provided, that the provisions as to hearing prior to unconditional release shall also apply to conditional releases, and, if, after a hearing and weighing the evidence, the court shall find that the condition of such person warrants his conditional release, the court shall order his release under such conditions as the court shall see fit, or, if the court does not so find, the court shall order such person returned to such hospital.

**11.** D.C.Code § 24–301(k) (1981) provides:

(k)(1) A person in custody or conditionally released from custody, pursuant to the provisions of this section, claiming the right to be released from custody, the right to any change in the conditions of his release, or other relief concerning his custody, may move the court having jurisdiction to order his release, to release him from custody, to change the conditions of his release, or to grant other relief.

(2) A motion for relief may be made at any time after a hearing has been held or waived pursuant to subsection (d)(2) of this section.

(3) Unless the motion and the files and records of the case conclusively show that the person is entitled to no relief, the court shall cause notice thereof to be served upon the prosecuting authority, grant a prompt hearing thereon, determine the issues, and make findings of fact and conclusions of law with respect thereto. On all issues raised by his motion, the person shall have the burden of proof. If the court finds by a preponderance of the evidence that the person is entitled to his release from custody, either conditional or unconditional, a change in the conditions of his release, or other relief, the court

ground that Snyder, who was committed to St. Elizabeth's after having been found not guilty by reason of insanity of first degree murder, remained mentally ill and dangerous to himself and others. Appellant argues here that "[h]e has had no hearing at which his then-current insanity was affirmatively demonstrated, under any standard of proof." Brief for Appellant at 14. He contends that under the principles we set forth in *Bolton v. Harris*, 395 F.2d 642 (D.C.Cir.1968), and other cases, as well as under the equal protection and due process clauses of the Constitution, the government must affirmatively establish that he is mentally ill and thereby dangerous.

■ We conclude that it is unnecessary to reach the constitutional questions that appellant advances because we find that he was civilly committed on July 20, 1960 in accordance with the full statutory safeguards to which he was then entitled. We hold that Snyder has already been accorded the relief he now seeks and also hold that there is ample evidence of record to support the district court's order denying the requests for release on the ground that Snyder is still mentally ill and poses a serious danger to himself and others.

The soundness of Snyder's position on appeal rests entirely on the validity of one of his fundamental premises. Succinctly stated, Snyder's argument is that his continued confinement, without a hearing at which the government must bear the burden of proving that he is still mentally ill and dangerous, violates his right to equal protection and due process because he was automatically committed to the hospital following an acquittal by reason of insanity based only upon a reasonable doubt that he was sane at the time of the murder. Snyder claims that he has been committed for

more than five years beyond the time when he presumably would have been paroled and therefore believes that "further commitment requires the same procedural protections afforded potential civil committees, including a jury trial at which the government must prove by clear and convincing evidence that he is presently mentally ill and thereby dangerous." Brief for Appellant at 17. The crucial premise in Snyder's argument is the assertion that he has *never* had a hearing at which the government bore the burden of proving that he was mentally ill and dangerous.

At oral argument a major point of discussion was whether hearings held in 1960 by the Mental Health Commission and subsequently by the district court established Snyder's insanity and dangerousness through the use of adequate procedural safeguards. On this point we have been successful in locating the record in Mental Health No. 1051–60. This reflects the *civil* commitment proceedings commenced against Snyder on June 8, 1960 and shows that in those proceedings he was afforded the full range of safeguards to which he was then entitled under the law. Because we have carefully reviewed all those proceedings, we describe them to save time for future courts.

The civil commitment proceedings initiated against Snyder were part of an effort to secure the appointment of a committee empowered to distribute part of Snyder's newly discovered assets to pay for attorneys' fees in connection with his defense of the 1956 first-degree murder charge.[12] Snyder had filed a petition as an indigent in that case to have counsel appointed by the trial court. Two attorneys, Charles J. Pilzer and Harvey A. Jacobs, were appointed and represented Snyder at the trial at which he was found not guilty by reason of insanity.

shall enter such order as may appear appropriate.

(4) A court may entertain and determine the motion without requiring the production of the persons at the hearing.

(5) A court shall not be required to entertain a 2nd or successive motion for relief under this section more often than once every 6 months. A court for good cause shown may in its discretion entertain such a motion more often than once every 6 months.

(6) An appeal may be taken from an order entered under this section to the court having jurisdiction to review final judgments of the court entering the order.

(7) An application for habeas corpus on behalf of a person who is authorized to apply

for relief by motion pursuant to this section shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court having jurisdiction to entertain a motion pursuant to this section, unless it also appears that the remedy by motion is inadequate or ineffective to test the validity of his detention.

12. On February 27, 1959, the district court found Snyder not guilty by reason of insanity in Criminal No. 1079–56. He was subsequently committed to St. Elizabeth's Hospital where he was still confined as a mental patient when the civil commitment proceedings were initiated on June 8, 1960.

The events that led to the initiation of civil commitment proceedings were outlined by Pilzer in his July 12, 1962 "Motion for the Allowance of an Attorneys' Fee":

> After the case was completed, it came to their attention [i.e. Snyder's counsel] that Mr. Snyder, in reality, was not indigent, but that he had a substantial amount of money to his credit at the Veterans Administration. They then petitioned Judge Keech, who had tried the case, to allow them a fee. The Judge expressed his willingness so to do, but suggested that they first have a Committee appointed. They attempted to have a Committee appointed, pursuant to the Judge's suggestion, and were informed that a civil commitment would be required. They then filed a petition for the civil commitment and a Guardian Ad Litem was appointed who recommended the commitment and the same was granted. Subsequent thereto, upon the petition to have a Committee appointed, an answer was filed by another Guardian Ad Litem, Charles W. Halleck, Esq., in which Mr. Halleck suggested that there was no need for a Committee in view of the Veterans Administration's position in the case. He

also stated in his report that "if the petitioner or any persons have rendered legal services to Snyder and are entitled to just and reasonable payment therefor, the Veterans Administration has advised this Guardian Ad Litem that such bills can be paid directly by the Veterans Administration."

(File II at 41.)

On June 8, 1960, Pilzer, as Snyder's "nearest friend," [13] filed a Petition for Writ de Lunatico Inquirendo, and for Appointment of Committee,[14] in which he stated that Snyder was entitled to $4,906.07 from the Veterans Administration because of a service connected disability incurred while in the military. Pilzer requested the court to: (1) issue a writ directing that Snyder's alleged insanity and unsoundness of mind be evaluated and determined, (2) refer the matter to the Mental Health Commission for a report and recommendations, and (3) appoint a committee of Snyder's person and estate.

On June 15, 1960, the district court ordered the writ issued and referred the petition to the Mental Health Commission (the Commission).[15] On June 21, 1960, the Sec-

13. The petition filed by Pilzer stated that Snyder had been unable to locate his wife and that he had no knowledge of her present address. Pilzer also stated that Snyder's father, who lived in New Jersey, had been fully informed of the situation but refused to give his consent to the proceedings or to intervene, preferring instead to have nothing to do with the matter. District Court File, Mental Health No. 1051–60.

14. Pilzer filed the petition in accordance with the provisions of D.C.Code § 21–310 (1951) which stated:

> Any person with whom an alleged insane person may reside, or at whose house he may be, or the father or mother, husband or wife, brother or sister, or the child of lawful age of any such person, or the nearest relative or friend available, or the committee of such person, ... may apply for a writ de lunatico inquirendo and an order of commitment, or either thereof, for any alleged insane person in the District of Columbia, by filing in the District Court of the United States for the District of Columbia a verified petition therefor, containing a statement of the facts upon which the allegation of insanity is based.

15. D.C.Code § 21–311 (1951) provided:

> Any petition filed in the equity court for a writ de lunatico inquirendo or for an order of commitment of any alleged insane person, shall be referred by the court to the Commission for report and recommendation within

such time as the court may designate, not exceeding seven days, which time may be extended by the court for good cause shown, and in such event the period of temporary commitment in Saint Elizabeths Hospital may be extended by the court for such additional time as the court shall deem necessary. The Commission shall examine the alleged insane person and any other person, including any suggested by the alleged insane person, his relatives, friends, or representatives, whose testimony may be relevant, competent, and material upon the issue of insanity; and the Commission shall afford opportunity for hearing to any alleged insane person, his relatives, friends, or representatives. At all hearings the alleged insane person shall have the right to be represented by counsel.

> The Commission is hereby authorized to conduct its examination and hearings of cases elsewhere than at the offices of said Commission in its discretion, according to the circumstances of the case.

> If in the determination of the Commission he be found not to be sane, then it shall be the duty of the Commission to apply to the court for a date for a hearing. In all cases before said hearing, the said Commission shall cause to be served personally upon the patient a written notice of the time and place of final hearing at least five days before the date fixed. Five days' notice of the time and place of the hearing shall in all cases be mailed to or served upon the applicant, but in

retary of the Commission had notice officially served on Snyder to inform him that a petition had been filed in the district court alleging that he was of unsound mind and seeking his commitment. Snyder was also notified that the Commission would conduct a hearing on the allegations of the petition. The notice informed Snyder that he could appear personally or by attorney to oppose the allegations of the petition. On June 22, 1960, the district court appointed a guardian ad litem to represent Snyder in the mental health proceedings.

On July 12, 1960, the Commission held its hearing. The following day the Commission filed its report and recommendations in which it found that Snyder was of unsound mind, suffering from schizophrenic reaction, chronic undifferentiated type, and was incapable of managing his own affairs. His mental condition was found to warrant commitment to a hospital for treatment. It was further found that he was not a resident of the District of Columbia and that he was entitled through the Veterans Administration to a disability pension of $4,906.07. Those present at the hearing included Dr. Stephen Klinger, of the Staff of St. Elizabeth's Hospital in charge of the maximum security building, who testified that Snyder was in need of continued hospitalization for his own safety and for the welfare of others. Also in attendance were Snyder's guardian ad litem, who interviewed Snyder and concurred in the Commission's recommendations; an attorney for the petitioner, Pilzer; and a Department of Public Health employee who gave biographical information about Snyder and testified about communications sent to Snyder's family members. The three-member panel of the Commission consisted of two physicians and an attorney.[16]

The unanimous Commission panel[17] recommended that Snyder be adjudged and decreed to be of unsound mind, that he be committed to St. Elizabeth's Hospital, that his maintenance and treatment be paid for according to statute, and that a committee be appointed to administer his affairs. The Commission's report and recommendations, which were officially served on Snyder, pursuant to statute,[18] indicated that he had five days in which to demand a trial by jury or a hearing by the court to determine the issue of his insanity.

On July 20, 1960, the district court held a final hearing[19] at which it entered a "De-

case the applicant is not the husband, wife, or nearest relative, the notice shall be mailed to or served upon the husband, wife, or nearest relative, if possible. The notice shall contain a statement that if the patient desires to oppose the application for a final order of commitment, he may appear personally or by attorney at the time and place fixed for the hearing. Proof of service shall be made at the hearing. The court may in its discretion appoint an attorney or guardian ad litem to represent the alleged insane person at any hearing before the court, or before the court and jury, and shall allow the attorney or guardian ad litem so appointed a reasonable fee for his services. Such fees may be charged against the estate or property, if any, of the alleged insane person.

16. The governing statute provided:
    There is hereby established a Commission on Mental Health (hereinafter referred to as the commission), which shall examine alleged insane persons, inquire into the affairs of such persons, and the affairs of those persons legally liable as hereinafter provided for the support of said alleged insane persons, and make reports and recommendations to the court as to the necessity of treatment, the commitment, and payment of the expense of maintenance and treatment of such insane persons.

[Commission to consist of nine members, eight physicians and an attorney]. The two physician members on active service and the lawyer member shall constitute the commission for the purposes of this section.... D.C.Code § 21–308 (1951).

17. D.C.Code § 21–316 (1951) required that "[r]ecommendations of the commission must be made by the unanimous recommendation of the three members acting upon the case."

18. D.C.Code § 21–312 (1951) provided:
    Upon the receipt of the report and recommendation of the commission, a copy shall be served personally upon the alleged insane person, his guardian ad litem, or his attorney, if he has one, together with notice that he has five days within which to demand a jury trial. A demand for hearing by the court, or a demand for jury trial for the purpose of determining the sanity or insanity of the alleged insane person may be made by the said alleged insane person or by anyone in his behalf, or a jury trial may be ordered by the court upon its own motion, ....

19. The district court noted in its Decree of Adjudication and Commitment that Snyder had made no demand for either a jury trial or further hearing by the court within the five days prescribed by law. See D.C.Code § 21–312 (1951), *supra*.

cree of Adjudication and Commitment" stating:

(1) That James R. Snyder is of unsound mind and is hereby committed to Saint Elizabeths Hospital until such time as he may be safely discharged therefrom, returned to the state of his residence or transferred to a veterans facility.

(2) That James R. Snyder is not a resident of the District of Columbia.

(3) That the expense of the maintenance and treatment of James R. Snyder in Saint Elizabeths Hospital shall be borne in accordance with the provisions of Public Law 724—80th Congress (District of Columbia Appropriations Act, 1949, approved June 19, 1948.) [20]

The district court civilly committed Snyder according to the prescribed statutory procedures.[21]

On August 8, 1960, Pilzer's attorney had served on Snyder a "Notice of Hearing on Petition for Appointment of Committee" for his person and estate. On the same day the district court appointed a new guardian ad litem for Snyder. On July 19, 1961, Pilzer filed a "Motion for Immediate Appointment of Committee," in which he petitioned the court to appoint him as Committee of Snyder. Pilzer stated that the former guardian ad litem had approved of Pilzer's appointment as Committee of Snyder, but that the new guardian ad litem had not yet filed a report commenting on Pilzer's appointment despite Pilzer's request for a report.

Apparently, the new guardian ad litem took no action until February 28, 1962 when he submitted a report in which he recommended that no committee be appointed since the Veterans Administration would directly pay Pilzer and any others for the reasonable costs they encountered in defending Snyder. Accordingly, on March 26, 1962, the district court ordered that no committee be appointed.

The guardian ad litem's February 28, 1962 report also pointed out that Snyder was in St. Elizabeth's Hospital pursuant to two commitments, one criminal and one civil. It stated that Snyder had been "adjudicated in a civil commitment proceeding as being of unsound mind, a fact which overcomes the ambiguous status resulting from a criminal commitment." It is not clear what was meant by that statement. Presumably, the intended meaning was that Snyder's insanity had been affirmatively established at the civil commitment proceedings whereas Snyder's insanity had not been directly established at the criminal proceeding when Snyder was found not guilty by reason of insanity. This part of the report apparently persuaded the district court on July 30, 1962 to issue an order modifying the July 20, 1960 Decree of Adjudication and Commitment. The court vacated and set aside as surplusage and unnecessary, in view of Snyder's February 27, 1959 criminal commitment, paragraphs 1, 2, and 3 of the July 20, 1960 decree. In their stead, the court substituted the following: "ADJUDGED and DECREED: 1. That James R. Snyder is of unsound mind." This

20. Pub.L.No.724, 62 Stat. 549–550 (1948) provides that after June 19, 1948, "funds of the District of Columbia shall not be available for the care of any person admitted hereafter to Saint Elizabeths Hospital who has not lived in the District of Columbia for more than one year immediately prior to application for voluntary admission or the filing of the petition provided for in the Act approved June 8, 1938, as amended. . . ."

21. D.C.Code § 21–314 (1951) outlined the procedure to be followed if no jury trial was demanded:

If no demand be made for a jury trial, the judge holding court shall determine the sanity or insanity of said alleged insane person,

but such judge may, in his discretion, require other proofs, in addition to the petition and report of the commission, or such judge may order the temporary commitment of said alleged insane person for observation or treatment for an additional period of not more than thirty days. . . .

D.C.Code § 21–315 (1951) governed commitment after trial:

If the judge be satisfied that the alleged insane person is insane, or if a jury shall so find, the judge may commit the insane person as he in his discretion shall find to be for the best interests of the public and of the insane person. . . .

reaffirms the civil adjudication of unsound mind.

## IV.

Based upon these facts there can be little dispute that Snyder's claim for relief must fail. Separate proceedings were held to determine Snyder's sanity. They were civil commitment proceedings and they complied with all the statutory safeguards to which he was then entitled (*e.g.,* notice of all proceedings, representation by appointed counsel, and opportunity to appear at the proceedings and call witnesses). The Commission after having received testimony found Snyder to be of "unsound mind." The district court accepted the Commission's recommendation that Snyder be adjudged and decreed to be of "unsound mind," and civilly committed him to St. Elizabeth's Hospital. Snyder remained committed in St. Elizabeth's Hospital under that valid, albeit duplicative, civil commitment decree for over two years until the district court modified the decree. The modification did not disturb the adjudication that Snyder was of "unsound mind." Under the statutory scheme existing at the time, a decree of "unsound mind" was synonymous with a determination of insanity. In fact, the governing statute at the time prescribed the form in which the Commission should make its recommendations to the district court and specifically used the phrase "of unsound mind" to refer to insanity.[22]

Although the record suggests that Snyder's civil commitment proceedings were originally commenced for the purpose of enabling the attorneys who defended Snyder in the first-degree murder case to be compensated for their services, the record also clearly shows that the civil commitment proceedings were conducted in good faith and strictly complied with the prescribed statutory procedures. Of particular importance is the fact that Snyder had due notice of the proceedings and that at all times during the civil commitment proceedings he was represented by a guardian ad litem whose sole charge was to represent Snyder's interests. Even though it might be said that the determination of Snyder's insanity at his earlier criminal trial was not established by the same standards as are applied in civil commitments, his insanity *was* established in the 1960 civil commitment proceedings. Thus, Snyder already has been accorded the due process and equal protection safeguards he now claims to have been denied.

Accordingly, Snyder has not stated a claim upon which relief may be granted. We affirm the district court's order denying the requests of both the hospital and Snyder for his unconditional release.

*Judgment accordingly.*

---

22. D.C.Code § 21–316 (1951) prescribed the form in which the Commission should make its recommendations concerning alleged insane persons. One alternative, paragraph (C), stated:

> (C) That the person is *of unsound mind* and (1) should be committed to Saint Elizabeths Hospital, or any other hospital provided by section 21–329, (a) at public expense, or (b) at the expense of those persons who are required by law, or who will agree to pay for the maintenance and treatment of said

insane person, or (c) that the relatives of said *insane person,* mentioned in section 21–321 are able to pay a specified sum per month toward the support and maintenance of said *insane person; . . .*
(Emphasis added).

That the statutory scheme contemplates the interchange of the phrases "of unsound mind" with "insanity" is further suggested by the language in D.C.Code § 21–311 (1951), which refers to "person[s] therein named to be insane or of unsound mind."